Eric F. MYERS, a taxpayer and resident of the State of Alaska, both individually and as a representative of other Alaska residents and taxpayers, Appellant,

v.

ALASKA HOUSING FINANCE CORPO-RATION; and Northern Tobacco Sec-uritization Corporation, Appellees.

No. S–9941.

Supreme Court of Alaska.

April 18, 2003.

Peter J. Maassen, Ingaldson Maassen, P.C., Anchorage, and Peter Gruenstein, Gruenstein & Hickey, Anchorage, for Appellants.

Douglas D. Gardner, Assistant Attorney General, Juneau, Joseph H. McKinnon, As-sistant Attorney General, Anchorage, Bruce M. Botelho, Attorney General, Juneau, and Robert M. Johnson, Wohlforth, Vassar, John-son & Brecht, Anchorage, for Appellees.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Alaska Constitution article IX, section 7 prohibits the legislature from dedicating future revenues directly to any special purpose. But can the legislature sell the state's right to a future revenue stream that is based on a settlement of a lawsuit and then immediately appropriate the proceeds? We conclude that selling the right to receive future revenue from the tobacco lawsuit settlement involved in the present case is constitutional for three reasons: (1) the legislative appropriation power includes the power to sell state assets, (2) lawsuit settlements are not traditional sources of public revenue, and (3) the legislature has the responsibility to manage the state's risk.

## II. FACTS AND PROCEEDINGS

In 1998 Alaska, along with numerous other states and territories, settled its past and present smoking-related claims, and provided a continuing release of future smoking-related claims, against the four largest tobacco manufacturers. The Master Settlement Agreement provided that the tobacco manufacturers would make annual payments to a fund from which the state would receive a portion in perpetuity. The state is projected to receive between $16 million and $36 million annually through 2031.

Eric Myers, a director of the Alaska Division of the American Cancer Society and proponent of tobacco-control programs, lobbied the legislature to spend a significant portion of the tobacco settlement on anti-tobacco initiatives. The legislature appropriated only $1.4 million from the state's general fund to such initiatives, substantially less than the $8.2 million requested. Funding for

rural school upgrades and construction was a competing priority, in part because a superior court had recently concluded that the then-existing education funding scheme violated the state constitution and the federal Civil Rights Act of 1964.[1]

To fund the extensive school improvements, the legislature could have appropriated funds from the state's general fund or could have proposed a bond measure that would have required voter approval. Instead, the legislature, viewing the state's right to future payments from the tobacco settlement as an asset, sought to sell it for a lump sum representing the present value of the future revenue stream from the settlement. The proceeds from the sale could then immediately be appropriated to finance the rural school improvements.

The legislature devised chapter 130, SLA 2000 to accomplish this objective without offending constitutional principles. Chapter 130, SLA 2000 authorized the commissioner of revenue to sell the right to receive forty percent of the annual revenue from the settlement to the Alaska Housing Finance Corporation (AHFC), "anticipated to be at least $93,000,000."[2] The legislature also authorized AHFC to create a subsidiary corporation and issue revenue bonds secured by the right to receive forty percent of the tobacco settlement.[3] The legislature then appropriated $164,876,000 from the anticipated proceeds of the bonds for school, university, port, and harbor construction, renovation, and improvement.[4]

AHFC created a subsidiary corporation, the Northern Tobacco Securitization Corporation (NTSC). The NTSC held public hearings to discuss the proposed sale of the tobacco settlement revenue stream. In early October 2000 the NTSC board of directors authorized the issuance of the bonds. At nearly the same time, Myers filed this suit seeking a declaratory judgment that chapter 130, SLA 2000 violated the prohibition on the dedication of funds found in article IX, section 7 of the Alaska Constitution. Myers later amended his complaint to request that the superior court enjoin the NTSC bond sale.

Following oral argument on Myers's request for declaratory judgment, Superior Court Judge Dan A. Hensley ruled that chapter 130, SLA 2000 was constitutional. Although he noted that the anti-dedication clause applied to all state revenue, which included money from lawsuit settlements, Judge Hensley concluded that reducing the settlement to present value and selling it for a lump sum did not violate the anti-dedication clause. He reasoned that the settlement was an asset unlike traditional types of revenue used for annual state government funding; that the form of the settlement as periodic payments instead of a lump sum was a mere fortuity; that settlements providing for periodic payments were fungible with lump sum settlements; and that because the continued payment of the settlement was not guaranteed, the legislature must be able to manage the state's assets to avoid risk. Because of the slippery slope argument that the legislature could reduce any asset consisting of a future revenue stream to present value, sell it, and appropriate the proceeds immediately, Judge Hensley emphasized that his ruling was limited to lawsuit settlements as a particular type of revenue. Myers appeals this decision.

After Judge Hensley's decision, the NTSC issued $116 million of revenue bonds secured by the right to receive forty percent of the future revenues from the tobacco settlement. The NTSC received $93 million and the remainder was used to pay the costs of issuance. The $93 million is now apparently being used for school and harbor construction projects as appropriated by chapter 131, SLA 2000.

## III. STANDARD OF REVIEW

█ This case requires us to decide if the enactment of chapter 130, SLA 2000 violates article IX, section 7 of the Alaska Constitu-

---

1. *Kasayulie v. State*, 3AN–97–3782 Ci. (Alaska Super., September 1, 1999).

2. Ch. 130, § 9, SLA 2000.

3. Ch. 130, §§ 7, 10, SLA 2000.

4. Ch. 131, SLA 2000.

tion. We use our independent judgment to decide constitutional issues.[5]

## IV. DISCUSSION

The sole issue presented in this appeal is whether the sale of the future revenue stream from the tobacco settlement violates the constitutional prohibition against dedicating a source of state revenue to any special purpose. We first discuss the anti-dedication clause and its interpretation, then determine that directly dedicating the tobacco settlement revenues would be unconstitutional, and finally conclude that the sale of the tobacco settlement revenue stream reduced to present value is constitutional.

### A. The Anti–Dedication Clause and Its Interpretation

■ Section 7 of article IX provides in relevant part that "[t]he proceeds of any state tax or license shall not be dedicated to any special purpose."[6] The drafters of the anti-dedication clause adopted it to preserve control of and responsibility for state spending in the legislature and the governor. " '[T]he more special funds [that] are set up the more difficult it becomes to deny other requests until the point is reached where neither the governor nor the legislature has any real control over the finances of the state.' "[7] The anti-dedication clause helps preserve the state's annual appropriation model and ensures that governmental departments will not be restricted in requesting funds from all sources.[8]

We have twice considered whether an appropriation violated the anti-dedication clause, but neither case presented a question similar to the one presented here. In *State v. Alex,* we decided that an act purporting to dedicate a "special assessment," rather than a tax or license, violated the anti-dedication clause because the clause applied to any source of public revenue.[9] In *Sonneman v. Hickel,* we held that an act violated the anti-dedication clause because it limited the ability of one state agency to request funding from revenues produced by the Marine Highway System.[10] In both cases, the unconstitutional acts dealt clearly with future allocation of future revenues; neither case involved a reduction to present value and outright sale of a future revenue stream. Accordingly, neither *Alex* nor *Sonneman* directly resolves the more complex question in the present case.

The Alaska anti-dedication clause is almost unique among state constitutions. Only Georgia has a similar provision, which indirectly was the source of the Alaska provision.[11] The relevant portion of the Georgia anti-dedication clause provides: "[N]o appropriation shall allocate to any object the proceeds of any particular tax or fund or a part or percentage thereof."[12]

The Georgia Supreme Court has interpreted its anti-dedication provision only once. In *State Ports Authority v. Arnall,* the Georgia legislature passed a bill appropriating all of the rentals received from a lease of the Western & Atlantic Railroad to the State Ports Authority for the purpose of paying

---

**5.** *See Halliburton Energy Servs. v. State, Dep't of Labor,* 2 P.3d 41, 50 n. 46 (Alaska 2000); *Chiropractors for Justice v. State,* 895 P.2d 962, 966 (Alaska 1995).

**6.** The remainder of section 7 of article IX provides three exceptions to the dedicated funds prohibition—the Permanent Fund, certain federal programs, and programs existing upon the date of ratification of the section—but neither party to this appeal argues that any of these exceptions applies.

**7.** *Sonneman v. Hickel,* 836 P.2d 936, 938 (Alaska 1992) (quoting 6 Proceedings of the Alaska Constitutional Convention (PACC) App. V at 111 (Dec. 16, 1955)).

**8.** *See id.* at 940.

**9.** 646 P.2d 203, 210 (Alaska 1982).

**10.** 836 P.2d at 940.

**11.** The idea for the anti-dedication clause apparently came from the Model State Constitution, whose anti-dedication clause is virtually identical to that of the Georgia Constitution. *See* Victor Fischer, ALASKA's CONSTITUTIONAL CONVENTION 142 (1975); Model State Constitution art. VII, § 7.03 *in* 1 CONSTITUTIONS OF THE UNITED STATES: NATIONAL AND STATE (Michael L. Shore & Abigail O'Donnell eds.2001).

**12.** GA. CONST. art. III, § IX, para. VI(a); GA. CONST. OF 1945 art. VII, § IX, para. IV.

bond debt.[13] The Georgia Supreme Court held that the appropriation was unconstitutional for two independent reasons: because it violated the provision concerning the creation of state debt and because it violated the provision prohibiting the dedication of funds.[14]

*Arnall*, however, is of limited use in resolving the present case. Like our earlier cases, *Arnall* dealt with the appropriation of future revenues and did not decide whether the sale of a future income stream reduced to present value violated the anti-dedication clause.

The state argues that *Arnall* "favorably" cited *Wright v. Hardwick*[15] and that this supports the constitutionality of the sale of a stream of revenue. In *Wright*, the Georgia legislature made an "outright sale of rentals to be received from the lease of the Western & Atlantic Railroad."[16] The Georgia Supreme Court approved of the sale because the " 'legislative act [did] not seek to authorize the creation of debt.' "[17]

The state's argument is unconvincing because it misconstrues *Arnall* and overstates the scope of *Wright*. First, *Arnall* did not favorably cite *Wright*. *Arnall* distinguished *Wright* in its creation-of-debt analysis and made no mention of *Wright* in its anti-dedication analysis.[18] Second, *Wright* did not support the contention that the sale of rentals from the railroad lease was constitutional under Georgia's anti-dedication provision, for *Wright* was decided before Georgia adopted its anti-dedication provision.[19] *Wright* was decided in 1921, well before the anti-dedication provision first appeared in the Georgia Constitution of 1945.[20] In fact, the appellant in *Wright* argued that the sale of the right to future rents violated the annual appropriation model of the Georgia constitution, but the court stated, "No scheme or fiscal policy for the state appears in any direct or express

language of the Constitution limiting all expenditures for the state in any one year to the revenues of the state derived from all sources during that year, and declaring that the revenues shall not be anticipated."[21] Thus, *Wright* did not, and could not, support the validity of a sale of future lease revenues with respect to Georgia's anti-dedication provision.

In sum, neither the text of our anti-dedication clause nor the relevant case law provides a direct answer to the question before us.

## B. The Tobacco Settlement Revenue Is Subject to the Anti–Dedication Clause.

■ The superior court ruled that the anti-dedication clause generally applied to the tobacco settlement revenue: "[A]lthough the Constitution speaks in terms of tax or license, the Alaska Supreme Court, in *State v. Alex*, interpreted that phrase to include all state revenues, which would include money from lawsuit settlements." This conclusion is consistent with existing case law.

In *State v. Alex*, we held in the context of a tax-like assessment on the sale of fish on behalf of a regional aquaculture association, that "the constitution prohibits the dedication of any source of revenue."[22] We expressly agreed with an Alaska Attorney General's opinion that states:

Section 7 of Article IX of the state Constitution can be given its intended effect and serve its repeatedly expressed purpose only if the words "proceeds of any tax or license" are interpreted to mean what their framers clearly intended, i.e., the sources of any public revenues.

Accordingly, it is our conclusion that the dedication of any source of public revenue: tax, license, rental, sale, bonus-royalty,

---

13. 201 Ga. 713, 41 S.E.2d 246, 247 (1947).

14. *Id.*

15. 109 S.E. 903 (Ga.1921).

16. *Arnall*, 41 S.E.2d at 254.

17. *Id.* (quoting *Wright*, 109 S.E. at 909).

18. *Id.* at 254.

19. *See id.* at 255.

20. *Id.* ("This [anti-dedication] provision was not contained in any constitution of this State prior to 1945.").

21. *See Wright*, 109 S.E. at 909.

22. 646 P.2d 203, 210 (Alaska 1982).

royalty, or whatever is limited by the state Constitution to those existing when the Constitution was ratified or required for participation in federal programs.[23]

A more recent informal opinion of the attorney general specifically stated that the constitution prohibited dedication of money from civil settlements: "[T]he constitutional prohibition against dedicated funds applies to money received from fines, penalties and civil settlements...." [24]

The conclusion that the anti-dedication clause applies to the tobacco settlement means only that a current legislature is prohibited from dedicating future settlement revenues to a particular purpose. Thus, the anti-dedication clause would prohibit the legislature from appropriating the tobacco settlement revenue stream for more than the immediately forthcoming fiscal year directly to secure a bond issue. But the legislature did not do this. Instead, the legislature sold the settlement reduced to present value. The question then becomes whether the sale of the tobacco settlement is unconstitutional because its effect is the same as a dedication of the future tobacco settlement revenue to repay the bond issue.

### C. The Sale of the Right to the Future Annual Payments from the Tobacco Settlement Is Not an Impermissible Dedication.

■ Determining the outcome of this case requires us to choose between competing constitutional values: the prohibition on dedicated funds and the legislative power to manage and appropriate the state's assets. Myers argues that allowing the state to sell the future revenues from the settlement defeats the purpose of the anti-dedication clause. The state argues that the tobacco settlement is a state asset, which the legislature is free to sell; upon the sale, the legislature may appropriate the proceeds. The superior court distinguished between the sale of the tobacco settlement and other "traditional kinds of revenues" and concluded that the transaction was constitutional. We agree with the superior court.

Myers interprets the prohibition of the anti-dedication clause broadly and concludes that chapter 130, SLA 2000 is unconstitutional because its effect is inconsistent with the purposes of the anti-dedication clause. Myers argues that the sale of the tobacco settlement conflicts with the annual appropriation model and effectively reduces the legislature's control of state assets because those anticipated future revenues become unavailable. He also argues that we should not allow the legislature to accomplish indirectly what it cannot do directly. Because the state admits that the legislature cannot dedicate forty percent of the tobacco settlement to secure bonds directly, Myers argues that the legislature should not be able to accomplish the same effect by the simple expedient of selling the right to future revenues from the tobacco settlement.

■ But Myers apparently does not dispute that the legislature has the power to sell a state asset like a building, and selling an income-producing asset could be viewed as inconsistent with the anti-dedication clause in the same ways as the sale of the tobacco settlement revenue stream. If the state owns a real property asset on which it collects rents, selling the property outright and appropriating the money effectively eliminates the rents as a source of revenue previously available to future legislatures. Likewise, if the state has loaned money, selling the state's interest in the repayment of the loan and appropriating the income eliminates the stream of revenue from future loan payments. The same considerations would apply if the state sold state property on an installment basis. Clearly the legislature has some power to manage the state's assets and to appropriate those proceeds in the year received even though such actions may conflict with the purposes of the anti-dedication clause.

■ The state interprets the anti-dedication clause narrowly and concludes that the tobacco settlement is simply an asset—a property, thing in action, or chose in action—which the legislature can sell and appropri-

---

**23.** 1975 Formal Op. Att'y Gen. 9 at 24.

**24.** 1986 Informal Op. Att'y Gen. vol. 1, at 429.

ate without violating the anti-dedication clause. If this proposition is accepted, there is no dedicated funds problem because the legislature has simply sold an asset and appropriated the revenue generated. No future revenues are impacted because the tobacco settlement no longer exists as a state asset that will produce future revenues. The state supports its interpretations with the opinion of the attorney general that the legislature's action was constitutional.[25]

The superior court expressly limited its ruling to the issue in this case—the sale of the tobacco settlement revenue stream. The superior court reasoned that the sale of the tobacco settlement was constitutional because of four distinctions between the tobacco settlement revenues and traditional kinds of state revenues: (1) lawsuit settlements are discrete and have a non-recurring nature; (2) the form of the lawsuit settlement as periodic payments instead of a lump sum is a matter of fortuity; (3) lawsuit settlements are more closely comparable to state assets than to taxes or other traditional sources of state revenue; and (4) the tobacco settlement entails some risk that the legislature must be able to manage. We agree with the superior court.

First, lawsuits and corresponding settlements have a non-recurring nature unlike other sources of state revenue relied upon in Alaska's annual appropriation process. Lawsuit settlements are not traditional sources of significant state revenue.[26]

Second, the form of the settlement as periodic payments instead of a lump sum is a matter of fortuity. Clearly, if the settlement had been a lump sum arrangement, the legislature would be free to immediately appropriate the settlement proceeds, and there would be no anti-dedication clause problem. Although Myers argues that the state could have negotiated for a lump sum, there is no reason to conclude it would have been successful. Indeed, the omnibus nature and the significant complexity of the settlement provided incentive to accept the settlement in the form offered. In any event, the form of the settlement should not dictate the constitutionality of the legislature's disposition of it.

Third, lawsuit settlements, even those involving periodic payments over time, are commonly considered to be assets or property as distinct from taxes or licenses.[27] Settlements involving payments over time are comparable with lump sum settlements by simply reducing them to present value.

Fourth, the legislature must be allowed to manage state assets so as to control risk. Myers does not appear to dispute that the legislature has the authority to manage the state's affairs in accordance with its judgment on risk avoidance, but he argues that there is little risk associated with the tobacco settlement revenue stream as evidenced by the bonds' ratings. To the extent that Myers asks us to decide the financial soundness of the sale (whether the tobacco settlement is sufficiently risky to warrant liquidation), we decline. That is a policy choice for the legislature.[28]

---

**25.** In general, the attorney general's opinion is entitled to "great weight," because the attorney general is "the officer charged by law with advising the officers charged with the enforcement of the law as to the meaning of it." *Allison v. State*, 583 P.2d 813, 816–17 n. 15 (Alaska 1978) (quoting *Smith v. Mun. Ct. of Glendale Jud. Dist.*, 167 Cal.App.2d 534, 334 P.2d 931, 935 (Cal.App. 1959)).

**26.** For example, in Alaska's fiscal year 2000, oil revenue, investment revenue, and restricted revenue (i.e., federal funds, trusts, dedicated funds, and statutorily restricted funds) accounted for approximately 94% of total state revenues. Unrestricted revenues accounted for approximately 6% of total revenues. Of those unrestricted revenues, just over two-thirds were from taxes and licenses. Other miscellaneous unrestricted reve-

nues, the only category under which lawsuits would fall, accounted for only 1.2% of total state revenues. Spring 2001 ALASKA DEP'T OF REVENUE, TAX DIVISION REVENUE SOURCES BOOK 9.

**27.** *E.g., Bandow v. Bandow*, 794 P.2d 1346, 1349 (Alaska 1990) (holding that a medical malpractice settlement consisting of an annuity paid in monthly installments was "in fact 'property'" in deciding how to divide that property in a divorce action).

**28.** *See Municipality of Anchorage v. Repasky*, 34 P.3d 302, 315 (Alaska 2001) (holding that court's decision appropriately adheres to policy choice the legislature has already made); *Elliott v. Settje*, 27 P.3d 317, 324 (Alaska 2001) (holding that legislature is charged with general policy

Myers argues that the state's narrow interpretation of the anti-dedication clause is a slippery slope: If the state can reduce the tobacco settlement revenue stream to a present value, sell it, and immediately appropriate the proceeds, the legislature could perform the same maneuver on almost any revenue stream, provided the existence of an interested buyer. For example, the legislature might sell the state's right to future oil and gas royalties and appropriate the proceeds immediately. Myers argues that no distinction exists between the tobacco settlement and oil and gas lease royalties as state assets. Myers's argument is beyond the scope of this case. Because the validity of selling future oil and gas royalty revenues reduced to present value is not posed by this case, we express no opinion on the constitutionality of that sort of transaction.[29]

## D. The NTSC's Issuance of Bonds Is Constitutional.

■ Assuming that the sale of the tobacco settlement was constitutional, the state argues that the NTSC's bond issue was constitutional. Although Myers asserts in one sentence that the legislature's act effectively circumvented article IX, section 8, which requires voter consent for a general bond issue, he does not develop the point. Accordingly, we consider the issue waived.[30]

■ Even if Myers had not waived the argument, the state is correct that the NTSC issued the bonds within the requirements of the constitution. Although article IX, section 8, provides that the state can contract debt only with ratification by a majority of the voters,[31] article IX, section 11, provides an exception for a state agency to issue revenue bonds secured only by the agency's

decision concerning preference for joint physical custody; court's role is only to apply law). *See also Malone v. Meekins*, 650 P.2d 351 (Alaska 1982) (political question doctrine).

**29.** The dissent proposes a five-factor test to determine whether a future income stream and the mechanics of its proposed disposition comport with the Alaska Constitution's anti-dedication clause. Today's opinion considers the dissent's first factor at length, and there is no question that the second factor is satisfied. The remaining three factors do not assist in answering the question before the court: whether the future income stream is an asset that may be sold consistent with the constitution.

The third factor—whether there is any limitation on the transferability of the interest in question—does not help in determining whether it is a constitutionally saleable asset. But even assuming that the factor is helpful, the dissent incorrectly applies it in this case. Section XVIII(p) of the master settlement agreement (1) limits its benefits ("rights") to the state only and (2) provides that the state may not assign its right *to enforce the agreement*. It is silent on whether a settling state may assign its right *to receive settlement funds*. We note also that Myers has not advanced any argument related to Section XVIII(p) of the master settlement agreement, a sufficient reason in itself not to reach the argument. *See Stosh's I/M v. Fairbanks N. Star Borough*, 12 P.3d 1180, 1183 & n. 12 (Alaska 2000) (When "a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal.") (quoting *Adamson v. Univ. of Alaska*, 819 P.2d 886, 889 n. 3 (Alaska 1991)).

The fourth factor—whether the future value of the income stream can be rationally predicted and whether the state might be required to perform contractual duties that conflict with its governmental duties—does not help in determining whether the revenue stream is an asset. Moreover, it is a truism that assets fluctuate in value, and there is no reason to believe that the statutory regime in this case did anything but give more—not less—certainty to the value of the right to receive the income. Finally, as to the conflict the dissent sees between the state's contractual duties and its governmental duties, it is illusory: Nothing in the master settlement agreement obligates the state to take steps to maximize the income stream. The state is obligated only not to interfere with AHFC's receipt of the income stream.

The fifth factor—whether the sale is what it purports to be, a conveyance of the state's right to the revenue—does not help in determining whether the revenue stream is an asset. Moreover, the dissent's application of the factor rests on its earlier incorrect conclusion that Part XVIII(p) of the master settlement agreement prevents the state from assigning its interest in the settlement proceeds. Because the master settlement agreement does not prohibit the state from assigning its interest in the settlement proceeds, it is irrelevant why the legislature chose the mechanism that it did.

**30.** *See Stosh's I/M*, 12 P.3d at 1183 & n. 12.

**31.** ALASKA CONST. art. IX, § 8 provides, in part: "No state debt shall be contracted unless authorized by law for capital improvements or unless authorized by law for housing loans for veterans, and ratified by a majority of the qualified voters of the State who vote on the question."

revenues.[32] Because the NTSC bonds were secured solely by the tobacco settlement revenues, the bonds are expressly permitted under article IX, section 11.

## V. CONCLUSION

Because the legislature sold the tobacco settlement and then appropriated the resulting income, it did not directly violate the anti-dedication clause. Although selling the tobacco settlement revenue stream is an indirect method of producing an effect very similar to the prohibited dedication of those future revenues, the anti-dedication clause clashes with the legislature's appropriation power. We conclude that the sale of the tobacco settlement is constitutional because the legislative appropriation power includes the power to sell state assets, lawsuit settlements are not traditional sources of public revenue, and the legislature has the responsibility to manage the state's risk. Accordingly, we AFFIRM the superior court's ruling.

BRYNER, Justice, with whom FABE, Chief Justice, joins, dissenting.

BRYNER, Justice, with whom FABE, Chief Justice, joins, dissenting.

I agree with the opinion's initial conclusion that the tobacco settlement revenue qualifies as a source of public revenue covered by the Alaska Constitution's anti-dedication clause.[1] But I have serious doubts about the court's main conclusion that chapter 130, SLA 2000, sells this revenue without violating the anti-dedication clause. Because the superior court did not address the issues that give rise to my doubts and the record contains insufficient information to resolve them, I would vacate the summary judgment order and remand to the superior court for further proceedings.

Today's opinion approves the state's sale of its tobacco settlement rights based on their discrete and non-recurring nature, on the fortuity of the settlement's future payout provisions, and on the fact that lawsuit settlements generally are viewed as assets. But it seems to me that the opinion too quickly accepts at face value the state's assurances that the purchase and sale agreement actually sells the state's current right to its tobacco settlement revenues; and in approving this sale, the opinion gives too much emphasis to the settlement's unusual and fortuitous nature.

The qualities relied on by today's opinion may indeed suggest that the sale's future revenues are capable of being treated as a present asset. But almost anything can be conceptualized as an asset: virtually all future events having any potential impact on state revenue could be expressed in estimated economic values, labeled as assets, reduced to present value, and "securitized." And surely a future revenue stream's unusual nature or unanticipated appearance on the horizon does not, standing alone, justify calling the revenue stream a presently salable asset; nor is there any reason to suppose, assuming that the revenue stream is in fact an asset, that every sale purporting to dispose of it at present value would actually comply with the anti-dedication clause. While the presence of these factors may provide an appropriate embarkation point for constitutional inquiry, their presence cannot eliminate the need for a hard look at all other relevant circumstances.

In my view, we must examine the character of the particular revenue stream at issue and the mechanics of its proposed disposition to ensure the sale's constitutional integrity: that is, to ensure both that a marketable asset exists and that the proposed sale would actually market it in a way that the anti-dedication clause allows. At least five factors seem relevant in examining these issues:

- The source and nature of the future revenues and how the law traditionally views similar revenues.

---

**32.** Alaska Const. art. IX, § 11 provides in relevant part: "The restrictions on contracting debt do not apply to debt incurred through the issuance of revenue bonds by a public enterprise or public corporation of the State or a political subdivision, when the only security is the revenues of the enterprise or corporation."

1. Alaska Const. art. IX, § 7; *see State v. Alex,* 646 P.2d 203, 210 (Alaska 1982) (construing the anti-dedication clause to include "the sources of any public revenue").

- Whether the state's right to the future revenues is fully vested at the time of the sale.
- Whether any law, rule, or contractual provision prohibits the state from selling its current right to the revenue or prevents the buyer from stepping into the state's shoes.
- Whether the revenue's future value can be rationally predicted and whether the sale obliges the state to perform contractual duties that might conflict with its basic governmental duties.
- Whether the sale conveys the state's right to the revenue or a right to receive the revenue from the state.

I believe that, when examined with an eye toward these factors, the master settlement agreement, the legislation implementing the state's sale of its settlement revenues,[2] and the state's purchase and sale agreement with AHFC and NTSC reveal serious potential flaws in the state's constitutional theory.

## 1. The source and nature of the revenue stream

Today's opinion focuses almost exclusively on this factor. The revenue stream at issue here is established by the tobacco settlement agreement; the opinion notes that the law traditionally treats legal settlements as assets. These points suggest to the court that the state's current interest in future revenues under the agreement can be regarded as an asset. But a note of caution seems necessary: the law does not invariably treat legal settlement agreements as transferrable property; it deems some settlement agreements non-transferrable because the transfer contemplated by the agreement would violate public interest. Settlements compromising future child support rights, for instance, are generally barred. Moreover, other settlement agreements are non-transferrable by their own terms. For example, a lease agreement containing an express non-assignment clause could render the lease interest not freely transferrable to a third party. In this case, as discussed below, there may exist both contractual and policy reasons for limiting transferability of the state's present settlement rights.

## 2. Whether the state's right is vested

The state's right to share in the master settlement agreement's settlement funds appears to be fully vested. This factor poses no apparent obstacle to treating the right as a current, marketable asset.

## 3. Whether the law or the settlement agreement bars the transfer

No state law bars the state from transferring its right to receive revenues under the settlement agreement, and the parties point to no federal law forbidding or limiting the transfer. But the settlement agreement itself imposes a limitation. The state fails to discuss this restriction, and neither the superior court nor this court's opinion gives it serious attention. Yet in my view it is potentially critical.

Part XVIII(p) of the master settlement agreement explicitly limits the intended benefits of the agreement to the settling states that joined in the agreement; and this provision expressly prohibits settling states from assigning their enforcement rights under the settlement agreement:

> (p) *Intended Beneficiaries.* No portion of this Agreement shall provide any rights to, or be enforceable by, any person or entity that is not a Settling State or a Released Party. No Settling State may assign or otherwise convey any right to enforce any provision of this Agreement.

On its face, this language appears to require that all settlement funds destined for Alaska be collectible exclusively by the state of Alaska; the language further seems to preclude the state from assigning to a third party like NTSC the state's right to demand payment, or any other benefit of the agreement, directly from the master settlement agreement's (MSA) escrow agent. Although this paragraph might not bar the state from selling to NTSC the state's present right to retain future settlement funds upon their receipt by the state, it does seem to say that the state cannot put a third party in its shoes

2. Ch. 130, SLA 2000.

by assigning the state's right to collect directly from the MSA escrow agent. The provision would appear to allow a settling state to sell only the right to acquire settlement payments *through* the state. As discussed more fully below, this distinction could have critical constitutional implications.[3]

### 4. Predictability of value and dependency on state's performance of governmental functions

This factor recognizes that constitutional policies can sometimes preclude legislation from treating future state revenues as marketable assets: for example, the revenue's future value might be so speculative as to defy meaningful prediction, thereby precluding statutory "assetization" of the revenue, since the legislation would amount to arbitrary and irrational state action; alternatively, a legislative directive to sell not-yet-realized revenues at present value might impermissibly constrain the executive branch's prerogatives by foreclosing its future ability to perform essential, constitutionally mandated governmental duties.

In my view, a policy concern of this latter kind arises under the purchase and sale agreement and deserves serious attention. Although the superior court and the opinion describe the tobacco settlement's payout provisions as "fortuitous," this description hardly seems accurate. The settlement agreement's opening recitals make it clear that the settlement is founded on and carefully structured to address the settling states' strong and continuing interests in promoting public health and reducing youth smoking. Reflecting these ongoing concerns and interests, the settlement agreement establishes a theoretically perpetual stream of future payments whose size will depend inversely on each state's ability to curb future smoking: the greater the success a state achieves, the lower will be its future payment stream.

From a settling state's perspective, this inverse relationship makes sense as long as the tobacco settlement's benefits inure exclusively to the settling parties, as Part XVI-

---

**3.** The court's opinion asserts that it is irrelevant to ask whether there is any limitation on transferability of the state's interest in the tobacco settlement revenues, since the inquiry "does not help in determining whether [that interest] is a constitutionally saleable asset." Opinion at 393, n. 29. But the transferability of the state's rights under the settlement agreement bears directly on the nature and scope of the state's current "asset": for example, a limit on transferability might altogether preclude any sale of future revenues, leaving the state with no currently salable asset at all; alternatively, a limitation might effectively preclude the state from selling its *entire* asset *now*, making the asset currently salable only by an agreement that commits the state to transfer title to its settlement revenues as they accrue—that is, by a dedication of future state revenues. Hence, an inquiry into transferability is relevant to the existence of a constitutionally salable asset.

The opinion further asserts that the dissent "incorrectly applies" this factor because Section XVIII(p) of the master settlement agreement only limits a transfer of enforcement rights and "is silent on whether a settling state may assign its right *to receive settlement funds*." Opinion at 393, n. 29. But this assertion assumes that a bar on conveyance of enforcement rights has no effect on the character of the state's currently salable asset. As explained more fully in the text of this dissent, Section XVIII(p) apparently bars a state from transferring its right to collect settlement revenues directly, consequently requiring the revenues to pass through the state when they are eventually paid, even though they have ostensibly already been sold. It hardly seems accurate, then, to say that Section XVIII(p) is completely silent on whether a settling state may assign its right to receive settlement funds.

Relatedly, the court notes that Myers does not specifically raise any argument based on Section XVIII(p) and has therefore failed to adequately brief the issue. Opinion at 393, n. 29. But Section XVIII(p) raises unresolved uncertainties concerning the broader constitutional point that Myers has unquestionably argued: whether the state's sale of its future tobacco settlement revenues violates the Alaska Constitution's anti-dedication clause. The superior court granted summary judgment on this point, declaring the sale to be constitutional. Since summary judgment would be permissible only if the record resolved all material issues in the state's favor and affirmatively established its right to judgment as a matter of law, Myers's failure to frame his constitutional argument in a particular way does not relieve this court of its duty to review the record for unresolved issues of fact that bear directly on Myers's constitutional claim. *See* Alaska R. Civ. P. 56; *cf. American Restaurant Group v. Clark*, 889 P.2d 595, 598 (Alaska 1995) (holding that party's failure to call particular evidence to court's attention "did not relieve the superior court of its obligation to examine the record before determining that no genuine issue of material fact existed").

II(p) of the settlement agreement itself (non-fortuitously) seems to require. The state stands to receive less if it succeeds in curbing smoking, but its loss of settlement revenues through decreased smoking will presumably be more than offset by the economic and public health benefits gained through the successful state regulatory efforts that caused the decrease in smoking. As long as the future revenues belong to the state, then, there is no possibility of irreconcilable tension between the state's two theoretically conflicting interests—maximizing its settlement revenues, on the one hand, and protecting the health and safety of its citizens, on the other. The settlement thus offers settling states a "win-win" situation.

But a sharp disparity of interests potentially arises when, as here, the state divorces its interest in receiving future settlement revenues from its vital interests in public health and safety by transferring its current right to future revenues to a group of third-party investors. As we have seen, under the terms of the master settlement agreement itself, the state's rights to receive benefits under the agreement cannot be assigned directly to a third party like NTSC; those rights can only be assigned vicariously, since the settlement agreement precludes their direct enforcement by anyone but a settling state. For this reason, the terms of the master settlement agreement apparently led the AHFC and NTSC to oblige the state, in the purchase and sale agreement, to pledge to make all efforts within its lawful powers to maximize the investors' future revenue stream—presumably, even if this means placing the investors' financial interests ahead of the state's governmental duty to protect the health and safety of its citizens.

The court dismisses the potential for this kind of conflict as "illusory," concluding that "[n]othing ... obligates the state to take steps to maximize the income stream. The state is obligated only not to interfere with AHFC's receipt of the income stream."[4] But the express terms of the purchase and sale agreement belie this conclusion. Specifically, the agreement strives to enhance investor confidence by explicitly requiring the state to promise, among other things, (1) to "take all actions as may be required by law fully to preserve, maintain, defend, protect and confirm [AHFC's and NTSC's] interest[s]"; (2) "not [to] take any action that will adversely affect [their] legal right to receive the Tobacco Assets"; (3) not to "impair the rights and remedies of Bondholders" until the bonds "are fully paid and discharged"; (4) "not [to] take any action and [to] use its best reasonable efforts not to permit any action to be taken by others that ... would result in the amendment, hypothecation, subordination, termination, or discharge of, or impair the validity or effectiveness of, the MSA or the Consent Decree"; (5) to "immediately pay over to the Trustee the proceeds of any Tobacco Assets received by the State in error"; and (6) to "exercise each and every right and remedy under the MSA."

Given the inverse relationship between the size of a settling state's future settlement payments and the state's future success in curbing the public dangers of smoking, these promises may well create an intolerable and irreconcilable tension between the state's contractual obligation to maximize revenues for bondholders and its non-delegable governmental duty to protect the public health and safety of its citizens. At some point, our constitution necessarily circumscribes legislative authority to approve private contractual arrangements that have the effect of preempting the executive's constitutionally based prerogatives;[5] so too, there are constitutional lines that no branch of government is authorized to cross by contracting away its own core governmental powers and duties.[6] Hence, even if the state's right to receive future settlement payments under the master settlement agreement might oth-

---

4. Opinion at 393, n. 29.

5. *Cf. Pub. Defender Agency v. Superior Court,* 534 P.2d 947 (Alaska 1975) (holding that separation of powers precludes judiciary from ordering the attorney general to prosecute particular cases of contempt of court).

6. *Cf. State v. Alex,* 646 P.2d 203, 211–13 (Alaska 1982) (precluding legislature from delegating its taxing power to private associations).

erwise be regarded as a marketable asset, concerns of this nature may well preclude "securitizing" these future revenues.

Because the parties and the superior court did not develop or meaningfully address this issue, I believe that it warrants further consideration on remand.

### 5. Whether the sale mechanism does what it purports to do

Not every transaction is what it purports to be. And the constitutionality of the transaction at issue here must ultimately be judged by what it does, not what it purports to do. I therefore believe that it is crucial to examine the mechanics of the state's sale of revenue rights to NTSC in order to determine if the sale actually and immediately conveyed what it purported to convey: "all right, title and interest of the State ... in and to" "forty percent of the revenue ... that the State has a right to receive from time to time under the MSA." There is reason to doubt that it did.[7]

As already mentioned, the master settlement agreement appears to preclude the state from assigning to NTSC the state's right to receive the tobacco settlement funds directly from the MSA escrow agent; the agreement seems to require that the funds be held for the benefit of the state by the MSA escrow agent until payment is due, and that they then be "transferred to the appro-

priate State–Specified Account for such Settling State."

The purchase and sale agreement seems to recognize this restriction but evidently attempts to skirt it by requiring the state to create a trust within its "State–Specified Account" and by having the state pledge its settlement payments to the account trustee upon their deposit. As currently presented, the details of this arrangement are sketchy. The arrangement is not precisely described in the parties' briefing or in the superior court's decision, and the trust agreement itself apparently has not been included in the appellate record. But the most likely scenario seems to be that as soon as the state's settlement payment is deposited in the state-specified account, the account's trustee (the bank in which the funds are deposited) divides the funds according to the terms of the purchase and sale agreement, disbursing forty percent to NTSC and sixty percent to the state general fund.

The preliminary prospectus describing NTSC's tobacco settlement asset-backed bonds appears to confirm this interpretation, emphasizing that "[t]he State may not convey and has not conveyed to NTSC or the Series 2000 Bondholders any right to enforce the terms of the MSA" and declaring that the MSA escrow agent "will disburse the [settlement] funds to the Settling States."[8]

The prospectus includes a flow chart that lends further support to this reading. This

---

7. Although the court accurately observes that this inquiry does not help in determining whether the revenue stream is an asset, Opinion at 393, n. 29, the court's observation misconstrues the inquiry's point, which is not to determine whether the revenue stream actually is an asset but to ascertain precisely what that asset is and whether the specific manner of its conveyance violates the anti-dedication clause. Nor is the court correct in asserting that, because the master settlement agreement does not forbid the state from selling its current interest in the future revenues, "it is irrelevant [to ask] why the legislature chose the mechanism that it did." Opinion at 393, n. 29. As detailed in the text, although the master settlement agreement may not preclude a present sale of the state's future revenues, the agreement's terms appear to dictate a payout mechanism that may be constitutionally problematic

because it channels the future revenues through a dedicated state fund as they are paid.

8. The purchase and sale agreement contains an ambiguous provision in which the state promises to "cause the Escrow Agent (as defined in the MSA) to deliver the Tobacco Assets directly to the Trustee for the benefit of the Corporation." Yet because the MSA itself seems to require payment directly into the "State–Specified Account," and because it also makes the state the sole beneficiary of the payment, it seems likely that the state has simply designated its bank as a trustee and empowered it to divide and distribute the MSA escrow agent's payments, upon deposit, according to the purchase and sale agreement's terms. It is nevertheless possible that a different mechanism has been established. Because the issue could be of central importance and has not been addressed, I think that it needs to be developed on remand.

chart depicts settlement payments flowing from the MSA escrow agent to the Alaska state-specified account, where the payments appear to be received as state revenue. According to the chart, after receipt in the state account, the money is divided into two separate funds, with forty percent flowing to NTSC and sixty percent to the state—presumably to the general fund. The chart labels NTSC's forty percent payment as "pledged revenues," suggesting that NTSC does not acquire these monies by direct payment from the MSA settlement, but instead as payment from state revenues representing NTSC's forty percent share of the total received by the state.

Seemingly, then, because the master settlement agreement prohibits the state from assigning its right to directly collect settlement revenues and requires settlement payments to be deposited to a state-specified account for its benefit, settlement payments necessarily arrive at the state-specified account as state revenues. The fact that the settlement payments are deposited into a state-specified account rather than into the state's general fund certainly would not, by itself, change their basic character upon deposit as state revenue; nor is it clear how the state could contractually alter the future payments' basic character as state revenue at the time of their receipt by creating a trust within its account that divides them after their deposit. For if the funds must be paid to the state for its exclusive benefit and received in a state-specified account, it would appear that the state's decision to dedicate this account to one or more specific purposes merely serves to make it a dedicated fund.

This is precisely what the dedication clause prohibits. After all, if the anti-dedication clause could be circumvented by the simple expedient of depositing state revenues into prerestricted trust accounts instead of the general fund, then compliance with the clause would be reduced to a minor accounting inconvenience.

Notably, Tamara Brandt Cook, Director of Legislative Services for the Legislative Affairs Agency, foresaw and warned of precisely this danger in her September 20, 2000, memo to Representative John Coghill. Addressing the problem under the appropriations clause rather than the anti-dedication clause, Cook commented that, "because the 'Tobacco Settlement' money is to flow to AHFC *upon receipt* without an appropriation, the arrangement may be vulnerable under Art. IX, sec. 13 of the state constitution." [9]

This subtle transactional wrinkle—that the settlement payments must be routed through the state instead of being paid by the MSA escrow agent directly to NTSC—appears to be dictated by the settlement's express non-assignment provision; and as Cook aptly notes, the wrinkle has a crucial bearing on the sale's constitutionality. For although the anti-dedication clause might permit an advance sale of the state's right to collect directly from the MSA escrow agent, it squarely prohibits the state from selling to NTSC the right to receive *from the state* the future revenues that the state itself will receive from the MSA escrow agent.

**9.** (Emphasis added.) A more complete rendition of Cook's remarks is as follows:

You have identified my main concern with respect to the financing mechanism used in HB 281. It seems to me that selling the right to receive future state revenues, regardless of the source of the revenue stream, could raise constitutional issues not usually implicated by the sale of other types of state assets simply because application of the constitutional appropriation requirement is avoided. It is generally recognized that money received by the state, even money received from the federal government or other sources for specific limited functions, must be appropriated before it may be spent.... For example, when the state enters into a lease[,] payment of the rent each year is subject to appropriation. Otherwise there is a risk that the lease creates an invalid state debt.... If the conveyed right to receive revenue is also, like the lease example, contingent upon appropriation of the revenue for that purpose once it is received, there would be little problem. However, because the "Tobacco Settlement" money is to flow to AHFC upon receipt without an appropriation, the arrangement may be vulnerable under Art. IX, sec. 13 of the state constitution. It could be urged in defense that the state never receives the "Tobacco Settlement" because it will go directly to AHFC and, therefore, it never becomes subject to appropriation. This argument sounds too much like a shell game to be very reassuring to me.

That the master settlement agreement does not explicitly preclude states from transferring their present interests in future settlement funds and instead speaks only of restricting a settling state's right to "assign or otherwise convey any right to enforce" the agreement's provisions hardly rescues a present transfer of future revenues from the anti-dedication clause's proscriptions. The anti-dedication clause looks to the character of the conveyance as well as its timing. Because the master settlement agreement requires settlement funds to be held for the exclusive benefit of the settling state, requires those funds to be paid into the state-specified account, and precludes the state from transferring any right to enforce the agreement's provisions, it appears that neither NTSC nor the state, acting on NTSC's behalf, could ever compel a distribution of settlement funds directly to NTSC; instead, the funds must seemingly pass to NTSC *through* the state. Yet if the present transaction merely conveys the right to receive settlement revenues through the state when it eventually receives them, then the state's presently conveyed property interest is not what the state claims it to be: it is not an immediate conveyance of the state's title to the revenue stream itself but only a present pledge to hand over the state's future revenues when they accrue, through an airtight mechanism structured to ensure that the pledge will be honored.

This form of sale—a dedication of proceeds from a source of future state revenue—would be impermissible whether characterized as a current sale at present value or as a promise to sell in the future.[10] It may be true that immediate "assetization" and sale of the state's settlement rights makes it possible for the state to "receive all of the tobacco settlement payments now, rather than over a period of years." But constitutionally speaking, the salient fact is that the state receives its immediate payment not in exchange for its right to receive settlement revenues directly from the MSA escrow agent, but in exchange for irrevocably pledging to hand over its

future settlement revenues as soon as the state receives them. AHFC and NTSC thus appear to be buying the fruit of the state's revenue tree, not the tree itself, years in advance;[11] yet the anti-dedication clause requires this fruit to be sold one year at a time, as it ripens.

The point seems worth stressing again: an assignment of the right to receive the state's future revenues *from the state* is paradigmatically a dedication of state revenues; it makes no constitutional difference that the purchase and sale agreement conveys a present interest in the state's future revenue stream if that stream flows through the state's hands before reaching NTSC's banks.

While the state goes to considerable lengths to justify the transaction by relying on opinions of various former attorneys general, these opinions lack persuasive force for the same reason that both the superior court's decision and today's opinion are unconvincing. The attorney general opinions all address the conceptual question of whether a state's right to receive future settlement revenues can be valued and sold as an asset. But in considering this point, they simply assume, or accept on faith, that the state's proposed sale actually will convey a share of the state's right to receive the settlement payment. None of the attorney general opinions take stock of the master settlement agreement's anti-assignment provision or discuss the agreement's apparent nullification of the state's ability to sell its direct rights to collect the revenue.

Former Attorney General Charles Cole's letter to Senator Torgerson exemplifies the omission: it expressly acknowledges that "once money is received by the State, it is 'public revenue' which may not be dedicated for a special purpose"; but the letter then accepts the state's characterization of the transaction at face value, assumes without examining the point that the settlement money will not be received by the state, and thus

10. *See Alex,* 646 P.2d at 210.

11. *Cf. Eisner v. Macomber,* 252 U.S. 189, 206, 40 S.Ct. 189, 64 L.Ed. 521 (1920) (using the analogy of a tree and its fruit to illustrate the important distinction between a transfer involving capital, that is, an asset that produces a benefit, and one involving income, or the benefit itself).

concludes that the sale will be valid.[12] Conceptually, the letter's observations are unassailable. Yet they incorrectly assume the truth of the state's unexplained and potentially unwarranted assertion that the "chose in action"—the thing that is to be sold here—is the state's right to *receive* the settlement.[13] Because the master settlement agreement appears to require that the state receive the MSA settlement first—before anyone else does—the chose in action may not be a share of the settlement proceeds as such, but merely a share of the state's settlement share.

Creating and freely trading in the present value of this kind of chose in action might be commonplace and entirely proper in the world of private finance. But in the sphere of state government, article IX, section 7 of the Alaska Constitution would strictly forbid it. For as Attorney General Cole's memorandum emphasizes, "upon receipt by the State, but not before, the 'proceeds' of the settlement are subject to the Section 7 constitutional restriction"; and "[o]nce money is received by the State, it is 'public revenue' which may not be dedicated for a special purpose."

In summary, the state's brief portrays the disputed transaction as a sale of the state's right to receive a stream of tobacco settlement funds. The superior court accepted this characterization of the disputed asset without serious question, and so has the court in its opinion. Yet it appears that this characterization may not reflect reality and may be barred by the express terms of the master settlement agreement. The transaction might more accurately be described as a sale of the right to receive from the state a portion of the state's future settlement revenues as soon as the state receives them. This distinction is critical for purposes of the anti-dedication clause. Moreover, it seems possible that other policy concerns might independently preclude recognizing the state's right to future settlement payments as a currently marketable asset: sale of that asset could potentially pit the state's contractual obligations to NTSC and its bondholders against the state's fundamental governmental duty to ensure public safety and welfare.

Neither the appellate record nor the record before the superior court provides sufficient information to resolve these concerns definitively. As matters currently stand, I

12. The pertinent text of Attorney General Cole's letter is as follows:

> Article IX, Section 7, of the Alaska Constitution provides that the proceeds of any state tax or license shall not be dedicated to any special purpose. Although this provision is limited by its express terms to the proceeds of a "state tax or license," and although the proceeds of the Tobacco settlement do not, strictly speaking, derive from the proceeds of any tax or license, in *State v. Alex*, 646 P.2d 203 (Alaska 1982) the Alaska Supreme Court held that the prohibition encompasses "the sources of any public revenues." Accordingly, upon receipt by the State, but not before, the "proceeds" of the settlement are subject to the Section 7 constitutional restriction.
> However, the right to receive future unpaid installments under the settlement is to be distinguished from the proceeds upon their receipt by the State. Once money is received by the State, it is "public revenue" which may not be dedicated for a special purpose. On the other hand, the right to receive future installments is a property right owned by the State, the same as other real and personal property owned by the State.... At common law, the right to receive future installments under the settlement is a "thing in action," more commonly referred to as a chose in action....

> Therefore under state law the right to receive future proceeds under the Tobacco settlement is state personal property which may be sold as any other state property. Furthermore, the right to receive a future stream of payments under the settlement is personal property which has a present value, similar in value to the right to receive future payments from the sale of other state real and personal property. It is this property right of current value which the proposed legislation contemplates being sold to AHFC, and it is the proceeds of the sale which will be appropriated for a public purpose, not the stream of future payments. These features remove the proposed legislation from the dedicated fund prohibition in Article IX, Section 7.

13. The state's conclusory assertion that its future revenues are "a chose in action" begs the question whether the mechanism it used to "sell" this "chose" effected an immediate transfer of the state's right to receive the future settlement revenues directly from the MSA escrow agent. It is interesting to wonder, in this regard, how the IRS might view the same sale mechanism in a transaction between private parties: would it treat NTSC's income as a receipt of tobacco settlement revenues, or would it tax the income as money NTSC received from the state?

do not believe that the record can support a declaratory judgment in favor of either party. I would therefore vacate the superior court's judgment and remand for further proceedings.

For these reasons, I dissent from the court's decision affirming the superior court's judgment.