*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| STATE OF ALASKA, MICHAEL HANLEY, COMMISSIONER OF ALASKA DEPARTMENT OF EDUCATION AND EARLY DEVELOPMENT, in his official capacity, ) ) ) ) ) ) | Supreme Court Nos. S-15811/15841 Superior Court No. 1KE-14-00016 CI |

STATE OF ALASKA, MICHAEL
HANLEY, COMMISSIONER OF        )
ALASKA DEPARTMENT OF           )    Supreme Court Nos. S-15811/15841
EDUCATION AND EARLY            )
DEVELOPMENT, in his official capacity,)  Superior Court No. 1KE-14-00016 CI
                               )
                               )    O P I N I O N
        Appellants and         )
        Cross-Appellees,       )    No. 7075 – January 8, 2016
                               )
    v.                         )
                               )
KETCHIKAN GATEWAY BOROUGH, )
AGNES MORAN, an individual, on her )
own behalf and on behalf of her son, )
JOHN COSS, a minor, JOHN       )
HARRINGTON, an individual, and )
DAVID SPOKELY, an individual,  )
                               )
        Appellees and          )
        Cross-Appellants.      )
                               )

Appeal from the Superior Court of the State of Alaska, First Judicial District, Ketchikan, William B. Carey, Judge.

Appearances: Kathryn R. Vogel, Rebecca Hattan, and Margaret Paton-Walsh, Assistant Attorneys General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Appellants/Cross-Appellees. Louisiana W. Cutler and Jennifer M. Coughlin, K&L Gates, LLP, Anchorage, for Appellees/Cross-Appellants, and Scott Brandt-Erichsen, Ketchikan Gateway Borough, Ketchikan, for Appellee/Cross-Appellant Ketchikan Gateway

Borough. William D. Falsey and John Sedor, Sedor, Wendlandt, Evans & Filippi, LLC and Saul R. Friedman, Jermain, Dunnagan & Owens, P.C., Anchorage, for Amici Curiae Association of Alaska School Boards, Alaska Council of School Administrators and Alaska Superintendents Association. Howard S. Trickey, Matthew Singer and Robert Misulich, Holland & Knight LLP, Anchorage, for Amicus Curiae Citizens for the Educational Advancement of Alaska's Children. Kim Dunn, Landye Bennett Blumstein LLP, Anchorage, for Amicus Curiae NEA-Alaska. A. Rene Broker, Borough Attorney, Fairbanks, for Amicus Curiae Fairbanks North Star Borough.

Before: Stowers, Chief Justice, Winfree, Maassen, and Bolger, Justices. [Fabe, Justice, not participating.]

BOLGER, Justice.
STOWERS, Chief Justice, and WINFREE, Justice, concurring.

## I.  INTRODUCTION

The State's local school funding formula requires a local government to make a contribution to fund its local school district. The superior court held that this required local contribution is an unconstitutional dedication of a "state tax or license." But the minutes of the constitutional convention and the historical context of those proceedings suggest that the delegates intended that local communities and the State would share responsibility for their local schools. And those proceedings also indicate that the delegates did not intend for state-local cooperative programs like the school funding formula to be included in the term "state tax or license." These factors distinguish this case from previous cases where we found that state funding mechanisms

violated the dedicated funds clause. We therefore hold that the existing funding formula does not violate the constitution, and we reverse the superior court's grant of summary judgment.

## II.   FACTS AND PROCEEDINGS

### A.   School Funding Formula

Article VII, section 1 of the Alaska Constitution requires the state legislature to "establish and maintain a system of public schools" open to all children in the state.[1] To fulfill this constitutional mandate, the legislature has defined three types of school districts according to where the district is located: city school districts, borough school districts, and regional education attendance areas.[2] "[E]ach organized borough is a borough school district";[3] a borough must "establish[], maintain[], and operate[] a system of public schools on an areawide basis."[4] Local school boards manage and control these school districts under authority delegated by AS 14.12.020. This statute requires local borough and city governments to raise money "from local sources to maintain and operate" their local schools.[5]

---

[1]     Alaska Const. art. VII, § 1 ("The legislature shall by general law establish and maintain a system of public schools open to all children of the State, and may provide for other public educational institutions.").

[2]     AS 14.12.010. City school districts are those located within a home-rule area or city but outside an organized borough. *Id*. Borough school districts are those located in organized boroughs. *Id*. Regional education attendance areas are those located outside organized city, home-rule, or borough boundaries. *Id*.

[3]     AS 14.12.010(2).

[4]     AS 29.35.160(a).

[5]     AS 14.12.020(c) ("The borough assembly for a borough school district, and the city council for a city school district, shall provide the money that must be raised
(continued...)

The local school funding formula begins with the concept of "basic need." This concept is intended to equalize districts by providing them with needed resources, taking into account differences among districts.[6] A statutory formula determines a district's basic need based on two variables: the district's adjusted average daily membership and the statewide base student allocation.[7] The district's adjusted average daily membership accounts for several metrics such as enrollment, school size, relative costs in the district, the number of students with special needs, and the number of correspondence students.[8] The base student allocation is a per-student allowance set by a statute that the legislature periodically revisits.[9]

---

(...continued)
from local sources to maintain and operate the district."). By contrast, the legislature funds districts located in the regional educational attendance areas, which lack taxing authority. *Id.* ("The legislature shall provide the state money necessary to maintain and operate the regional educational attendance areas."); *see* Alaska Const. art. X, § 2 ("The State may delegate taxing powers to organized boroughs and cities only."); *Matanuska-Susitna Borough Sch. Dist. v. State*, 931 P.2d 391, 399-400 (Alaska 1997) (stating that taxing power explains, in part, why the legislature treats districts differently).

[6] ALASKA DEP'T OF EDUC. & EARLY DEV., ALASKA'S PUBLIC SCHOOL FUNDING FORMULA: A REPORT TO THE ALASKA STATE LEGISLATURE 8 (2001).

[7] AS 14.17.410(b)(1).

[8] AS 14.17.410(b)(1)(A)–(D); AS 14.17.420(a).

[9] AS 14.17.470; *see e.g.*, ch. 9, §§ 8–10, SLA 2008 (setting the amount at $5,480 for 2008, $5,580 for 2009, and $5,680 for 2010); ch. 41, § 7, SLA 2006 (setting the amount at $5,380 for 2006). As of November 2015, the per-student allowance is $5,830. AS 14.17.470.

To fulfill this basic need, districts receive "state aid, a required local contribution, and eligible federal impact aid."[10] State aid comes from the "public education fund," to which the legislature allocates funds annually.[11] The amount of state aid that a district receives is based on three variables: the district's "basic need," the district's required local contribution (if any), and the district's federal impact aid.[12] If state appropriations fall short of the amount of state aid calculated under AS 14.17.410, then the State must reduce each district's basic need on a pro rata basis.[13]

The required local contribution offsets the amount of state aid provided to satisfy a district's basic need.[14] Satisfying the local contribution requires a local community to contribute an amount that falls within a statutory range that reflects the value of taxable real and personal property located within the district.[15] At minimum the contribution must equal the "equivalent of a 2.65 mill tax levy on the full and true value of the taxable real and personal property in the district as of January 1 of the second preceding fiscal year."[16] The State, however, cannot require an organized borough or

---

[10]    AS 14.17.410(b).

[11]    *See* AS 14.17.300.

[12]    AS 14.17.410(b)(1).

[13]    AS 14.17.400(b).

[14]    *See* AS 14.17.410(b)(1) ("[S]tate aid equals basic need minus a required local contribution and 90 percent of eligible federal impact aid for that fiscal year.").

[15]    AS 14.17.410(b)(2). The local contribution includes "appropriations and the value of in-kind services made by a district." AS 14.17.990(6).

[16]    AS 14.17.410(b)(2). A *mill rate* is "a tax applied to real property whereby each mill represents $1 of tax assessment per $1,000 of the property's assessed value." BLACK'S LAW DICTIONARY 1084 (10th ed. 2014).

city to contribute more than "45 percent of a district's basic need for the preceding fiscal year."[17] A city or borough school district also may make a voluntary contribution, but a statutory cap prevents a local community from contributing more than the greater of the "equivalent of a two mill tax levy on the full and true value of the taxable real and personal property in the district" or "23 percent of the total of the district's basic need for the fiscal year."[18] Thus, under the current framework, organized boroughs and cities work together with the State to support public schools.

## B.     Prior Proceedings

Ketchikan Gateway Borough is an organized borough that must annually contribute to fund its schools under AS 14.12.020.[19] The required payment, set by the school funding formula,[20] supports the Ketchikan Gateway Borough School District. In 2013, the district's "basic need" for the upcoming 2014 fiscal year was almost $26 million; the required local contribution was about $4.2 million. Though the Borough contributed this amount "under protest," it voluntarily contributed an additional $3.8 million. After contributing the funds, the Borough brought suit against the State, asking the superior court, first, to declare the required local contribution unconstitutional; second, to enjoin the State from requiring the Borough to comply with the statute; and,

---

[17]     AS 14.17.410(b)(2).

[18]     AS 14.17.410(c)(1)–(2).

[19]     AS 14.12.020(c) ("The borough assembly for a borough school district . . . shall provide the money that must be raised from local sources to maintain and operate the district."). Ketchikan Gateway Borough incorporated as a second-class borough on September 13, 1963. Ketchikan Gateway Borough, Alaska, Code 01.05.040 (2015).

[20]     *See* AS 14.17.410(b)(2) ("[T]he required local contribution of a city or borough school district is the equivalent of a 2.65 mill tax levy on the full and true value of the taxable real and personal property in the district . . . .").

third, to direct the State to refund its protested $4.2 million payment. Both parties moved for summary judgment.

The superior court partially granted the Borough's motion. It agreed with the Borough that the required local contribution violated the dedicated funds clause under article IX, section 7 of the state constitution. The dedicated funds clause provides:

> The proceeds of any state tax or license shall not be dedicated to any special purpose, except as provided in section 15 of this article or when required by the federal government for state participation in federal programs. This provision shall not prohibit the continuance of any dedication for special purposes existing upon the date of ratification of this section by the people of Alaska.[21]

The superior court concluded that the required local contribution constituted the proceeds of a state tax or license; that the local contribution statute earmarked those funds for a specific purpose and prevented the legislature from using the funds in any other manner; and that the required local contribution was not exempt from the constitutional prohibition against dedicated funds.

The superior court denied summary judgment on the Borough's other claims. It concluded that the local contribution did not violate the appropriations or governor's veto clauses and that equity did not require the State to refund the local contribution to the Borough for the 2014 fiscal year.

The appropriations clause under article IX, section 13 provides: "No money shall be withdrawn from the treasury except in accordance with appropriations made by law. No obligation for the payment of money shall be incurred except as authorized by law. Unobligated appropriations outstanding at the end of the period of

---

[21] Alaska Const. art. IX, § 7.

time specified by law shall be void."[22]  And the governor's veto clause under article II, section 15 provides:  "The governor may veto bills passed by the legislature.  He may, by veto, strike or reduce items in appropriation bills.  He shall return any vetoed bill, with a statement of his objections, to the house of origin."[23]  The court concluded that neither clause was violated because the required local contribution "does not enter the state treasury" and because the required local contribution is not an appropriation.  The court further concluded that it was unproblematic that the required local contribution never entered the state treasury.  In denying the Borough's request for a refund, the court explained that the State was not unjustly enriched because the required local contribution did not benefit the State.

The State appealed and the Borough cross-appealed, together asking us to consider all four prongs of the superior court's decision:  whether the required local contribution is unconstitutional under the dedicated funds, appropriations, or governor's veto clauses and, if so, whether equity requires refunding the Borough's protested payment.[24]

---

[22]    Alaska Const. art. IX, § 13.

[23]    Alaska Const. art. II, § 15.

[24]    Six amici also filed briefs.  The Fairbanks North Star Borough filed in support of the Borough.  Five amici filed in support of the State:  the Citizens for the Educational Advancement of Alaska's Children and the NEA-Alaska each filed a brief; and the Association of Alaska School Boards, the Alaska Council of School Administrators, and the Alaska Superintendents Association filed a joint brief.  The Association of Alaska School Boards is "the organization and representative agency of the members of the school boards of the state."  The Alaska Council of School Administrators describes itself as an umbrella organization for "four of Alaska's premier educational leadership organizations," including the Alaska Superintendents Association. The Citizens for the Educational Advancement of Alaska's Children describes itself as

(continued...)

## III. STANDARD OF REVIEW

"We review a grant or denial of summary judgment de novo."[25] Questions of constitutional and statutory interpretation, including the constitutionality of a statute, are questions of law to which we apply our independent judgment.[26] We adopt the "rule of law that is most persuasive in light of precedent, reason, and policy."[27] Legislative history and the historical context, including events preceding ratification, help define the

---

[24] (...continued)
a coalition of 23 member school districts and educators, founded in 1998 to "address the problem of aged and deteriorated schools in rural Alaska." NEA-Alaska describes itself as a "statewide labor organziation of 13,000 certified educators and education support professionals serving in Alaska's public schools."

[25] *State v. Schmidt*, 323 P.3d 647, 654 (Alaska 2014) (quoting *Alaska Civil Liberties Union v. State*, 122 P.3d 781, 785 (Alaska 2005)).

[26] *Id.* at 655.

[27] *Se. Alaska Conservation Council v. State*, 202 P.3d 1162, 1167 (Alaska 2009) (quoting *Premera Blue Cross v. State, Dep't of Commerce, Cmty.& Econ. Dev., Div. of Ins.*, 171 P.3d 1110, 1115 (Alaska 2007)).

constitution.[28] Statutes passed immediately after statehood give insight into what the founders intended.[29] We presume statutes to be constitutional; the party challenging the statute bears the burden of showing otherwise.[30]

## IV.   DISCUSSION

### A.   The School Funding Formula Does Not Violate The Dedicated Funds Clause.

Before Alaska became a state in 1959, the Territory and local areas shared

---

[28]    *See State v. Alex*, 646 P.2d 203, 208 (Alaska 1982) ("[T]he sense in which 'tax' is used in article IX, section 7 of the [Alaska] [C]onstitution must be determined from its context, both in the text and according to the discussions at the constitutional convention which adopted the wording."); *Hootch v. Alaska State-Operated Sch. Sys.*, 536 P.2d 793, 800 (Alaska 1975) ("[A]n historical perspective is essential to an enlightened contemporary interpretation of our constitution."); *id*. at 804 (explaining that the events preceding ratification supported the court's interpretation of the state constitution).

[29]    *See Bradner v. Hammond*, 553 P.2d 1, 4 n.4 (Alaska 1976) ("Contemporaneous interpretation of fundamental law by those participating in its drafting has traditionally been viewed as especially weighty evidence of the framers' intent."); *cf. J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 412 (1928) (citing *Myers v. United States*, 272 U.S. 52, 175 (1926)) ("This Court has repeatedly laid down the principle that a contemporaneous legislative exposition of the [U.S.] Constitution when the founders of our government and framers of our Constitution were actively participating in public affairs long acquiesced in fixes the construction to be given its provisions.").

[30]    *Se. Alaska Conservation Council*, 202 P.3d at 1167.

responsibility for funding public education.[31] The legislature derived the current school funding formula from this pre-statehood program, the framework of which has remained largely unchanged.[32]

The Borough contends that the school funding program is a "state tax or license" that is subject to the dedicated funds clause because it is not a "dedication . . . existing upon the date of ratification of [the Alaska Constitution]"[33] and because no other exemption from the dedicated funds clause applies. Accordingly it concludes that the required local contribution violates the dedicated funds clause. First the Borough claims that before statehood, "municipalities exercised independent judgment and discretion as to what they could afford to pay for schools" and notes that "cities were not required to provide any particular amount to the school districts." Second the Borough argues that the refund amount that cities received from the Territory "depended on how much was appropriated by the Legislature for such purpose."

However, as we explain below, the required local contribution is the most recent iteration of a longstanding state-local cooperative program in which local communities and the State share responsibility for funding Alaska's public schools. Accordingly, whether or not it is a dedication that predated statehood, the required local contribution is not a "state tax or license" within the meaning of the dedicated funds clause.

---

[31] *See* §§ 37-3-31 to -33, 37-3-41, 37-3-62 Alaska Compiled Laws Annotated (ACLA) (1949). For example, section 37-3-62 of the Compiled Laws of Alaska required the Territory to refund local districts for part of the cost of maintaining local schools.

[32] *See* AS 14.17.410; §§ 37-3-31 to -33, 37-3-41, 37-3-62 ACLA.

[33] Alaska Const. art IX, § 7.

### 1. Under the Alaska Compiled Laws of 1949, the Territory and local communities shared responsibility for funding local schools.

Boroughs did not exist before Alaska became a state. Under the Alaska Compiled Laws of 1949, each city constituted a single school district and each had an obligation to provide public school services.[34] An incorporated city also could join with adjacent areas to form an independent school district.[35] Local school boards, which oversaw local school activities, had the power to assess, levy, and collect taxes to assist with this obligation to support their schools.[36] Though territorial law did not dictate an exact funding amount, it required cities to provide "suitable school houses . . . and . . . the necessary funds to maintain [local] public schools"[37] or, if part of an independent school district, to set aside funding for their share of local school costs.[38] Like today, local communities enjoyed discretion in determining how to satisfy their funding obligation. They could dedicate a special school tax to the purpose, or they could

---

[34]    *See* § 37-3-32 ACLA ("Every city shall constitute a school district and it shall be the duty of the [city] council to provide the [school district] with . . . the necessary funds to maintain public schools . . . .").

[35]    *Id.* § 37-3-41.

[36]    *Id.* §§ 37-3-24 to -26, 37-3-32, 37-3-53; *see also id.* § 37-3-33 (establishing authorized expenditures by the school board). These boards possessed the same power to tax as the then-existing municipal corporations and incorporated cities. *Id.* § 37-3-25.

[37]    *Id.* § 37-3-32.

[38]    *Id.* § 37-3-53.

dedicate a portion of the general municipal tax to the purpose.[39] Territorial law also required school boards to annually submit to the Territory a budget of anticipated expenses, a record of all funds collected, and receipts for their expenses.[40]

Local communities also received support for local schools from the Territory. Territorial law provided for the legislature to refund a portion of local school expenses from time to time.[41] The amount local communities received reflected a statutory formula that considered factors like the number of students in the district, the total amount the district spent to maintain its school system, and the expenses the Territory had approved in the district's budget.[42] Thus before Alaska became a state, local communities and the Territory together supported local schools, much like today.

---

[39]    *Id*. § 37-3-35; *see* AS 14.17.990(6) (defining "local contribution").

[40]    §§ 37-3-55, 37-3-63 ACLA.

[41]    *Id*. §§ 37-3-61 to -62.  Alaska Compiled Laws of 1949 section 37-3-61 provided:

> Such per centum of the total amount expended for the maintenance of public elementary schools and high schools, within the limits of any incorporated city or incorporated school district . . . as the Legislature may from time to time direct, shall be refunded to the school fund of said incorporated city or incorporated school district . . . from the moneys of the Territory . . . .

This refund from the Territory reflects the current state-local cooperative funding program. *See* AS 14.17.410 (public school funding).

[42]    *See* §§ 37-3-61 to -64 ACLA. School districts with more students received proportionally less than school districts with fewer students. *Id*. § 37-3-62. Refunds were not available for certain expenses, including the cost of levying and collecting taxes and conducting board elections. *Id*. § 37-3-64.  In reviewing a district's budget, the Territory had the authority to "disapprove or reduce any items in the budget" in calculating the amount of reimbursement. *Id*. § 37-3-63.

**2. The framers drafted the constitution to allow such state-local cooperative programs to continue after statehood.**

The delegates at the constitutional convention recognized the benefits of such state-local cooperative programs.[43] But they also recognized the importance of preserving state control over state revenue.[44] Through the dedicated funds clause of article IX, section 7, the delegates sought to balance such concerns.[45] Early drafts of the clause generally prohibited the dedication of state revenue while allowing for certain

---

[43] *See, e.g.*, 4 Proceedings of the Alaska Constitutional Convention (PACC) 2651 (Jan. 19, 1956) (statement of Delegate Londborg) (explaining that state-local cooperative programs would encourage local communities to organize into boroughs, the new form of local governance).

[44] 1975 FORMAL OP. ATT'Y GEN. Opinion 9, at 3 (May 2, 1975); 3 ALASKA STATEHOOD COMM'N, CONSTITUTIONAL STUDIES pt. IX, at 27-30 (1955); 4 PACC 2414 (Jan. 17, 1956).

[45] *See, e.g.*, 4 PACC 2413-16 (Jan. 17, 1956). The delegates, for example, rejected an amendment to the dedicated funds clause proposed by Delegate Buckalew that would have deleted a sentence in the clause that allowed for existing dedications to continue. *Id.* at 2416. Delegate Buckalew had expressed concern that "the [only] sensible sound way to run a state is to abolish this practice [of earmarking funds] which leads to evils as far as the fiscal management of the state is concerned." *Id.* at 2413. Delegate Peratrovich, who participated in the committee that drafted the clause, responded that the committee sought to strike a compromise:

> [Y]ou have to compromise. . . . [I]t was dangerous to give free rein to the new state in earmarking funds. However, I realize . . . that there was some good being accomplished by those earmarked funds that we have on the books today and I feel that I cannot support [Buckalew's amendment] on that condition.

*Id.* at 2414.

-14- 7075

exceptions.  The delegates recognized, for example, that dedications should be allowed when required to participate in federal programs and when such dedications preexisted statehood.  One such draft provided:

> All tax revenues shall be deposited in a general fund to be established and maintained by the state.  This provision shall not prohibit the continuance of any special fund for special purposes existing at the effective date of the constitution.[46]

A subsequent draft modified the first sentence:  "All revenues shall be deposited in the State treasury without allocation for special purposes, except where state participation in Federal programs will thereby be denied,"[47] and preserved the exemption for allocations in existence at the time of statehood.[48]

But the delegates feared that this draft language might prohibit too much.[49] Accordingly they modified the clause in two key respects.  First, they reworded the clause by replacing "[a]ll revenues" with "proceeds of any state tax or license."  Second, they revised the last sentence by replacing "any special fund" with "any dedication":

> The *proceeds of any state tax or license* shall not be dedicated to any special purpose, except as provided in section 15 of this article or when required by the federal government for state participation in federal programs.  This provision *shall not prohibit the continuance of any dedication*

---

[46]     FORMAL OP. ATT'Y GEN., *supra* note 44, at 3 (quoting the draft) (internal quotation marks omitted).

[47]     *Id*. at 4 (quoting the draft) (internal quotation marks omitted).

[48]     *Id*. at 8 ("This provision shall not prohibit the continuance of any allocation existing upon the date of ratification of this Constitution by the people of Alaska." (quoting the draft) (internal quotation marks omitted)).

[49]     *See id*. at 5; 3 PACC 2302 (Jan. 16, 1956) (statement of Delegate Nerland).

for special purposes existing upon the date of ratification of this section by the people of Alaska.[50]

Through such revisions, the delegates recognized that any prohibition on dedicated funds required reasonable limits. A flat prohibition was neither feasible nor desirable.[51] The dedicated funds clause could not be "strict[ly] interpret[ed]" because both legal and contractual obligations would "require a segregation of certain moneys," including:

> pension contributions, proceeds from bond issues, sinking fund receipts, revolving fund receipts, *contributions from local government units for state-local cooperative programs*, and tax receipts which the state might collect on behalf of local government units.[52]

Delegate White explained that the amended language allowed these exceptions to continue: "By going to the tax itself and saying that the tax shall not be earmarked, we eliminated [the need to make explicit] all seven of those exceptions."[53]

The colloquy among the delegates reflects this deliberate compromise embodied by the clause. Just as the delegates voiced the need for State control over state revenue, the delegates lauded the clause for preserving certain programs, including those

---

[50]     Alaska Const. art. IX, § 7 (emphasis added).

[51]     *See* PUB. ADMIN. SERV., COMMENTS FROM PUBLIC SERVICE ADMINISTRATION ON FINANCE COMMITTEE PROPOSAL 1 (Jan. 4, 1955); *see also* FORMAL OP. ATT'Y GEN., *supra* note 44, at 7 (quoting PUB. ADMIN. SERV., *supra*, at 1).

[52]     PUB. ADMIN. SERV., *supra* note 52, at 1 (emphasis added); *see also* FORMAL OP. ATT'Y GEN., *supra* note 44, at 7 (quoting Pub. Admin. Serv., *supra*, at 1).

[53]     4 PACC 2363 (Jan. 17, 1956) (statement of Delegate White); *see also* FORMAL OP. ATT'Y GEN. , *supra* note 44, at 7 (quoting PUB. ADMIN. SERV., *supra* note 52, at 1); *Se. Alaska Conservation Council v. State*, 202 P.3d 1162, 1169 n.29 (Alaska 2009) (noting the exceptions). Both the Borough and the State appear to agree that the delegates amended the clause to avoid interfering with programs such as pension contributions and state-local cooperative programs.

for "highways, airports, and schools."[54] Through this compromise, the delegates allowed dedications "now on the statute books [to] be left in effect as long as the legislature saw fit to leave them there,"[55] and, as Delegate White noted, the delegates allowed setting aside certain monies pursuant to statute, including those for state-local cooperative programs.[56]

The delegates recognized that an arrangement of shared responsibility between the State and local communities offered substantial benefits, particularly in the transition to the borough system of local governance. Active participation in local governance promised to save the State "hundreds of thousands of dollars of the taxpayers' money."[57] Cooperative programs, like those in which the State and local communities shared the cost of providing local public services, encouraged unincorporated areas to incorporate by reassuring them that they would "definitely benefit by organizing . . . [to] get[] into the picture of local government."[58] Existing cost-sharing programs between the Territory and local communities, like that in education, combined with increased local control over education and other services offered such incentives.[59]

---

[54] FORMAL OP. ATT'Y GEN., *supra* note 44, at 12-13.

[55] 4 PACC 2415 (Jan. 17, 1956) (statement of Delegate Nerland); *see also id.* at 2369-70 (statement of Delegate Peratrovich).

[56] *See id.* at 2363 (statement of Delegate White) (explaining that the seven former exceptions were now implicit in the amended clause); FORMAL OP. ATT'Y GEN., *supra* note 44, at 7 (identifying the seven exceptions to which Delegate White referred).

[57] 4 PACC 2652 (statement of Delegate Londborg).

[58] *Id.* at 2651 (statement of Delegate Londborg).

[59] *See id.*; *id.* at 2650 (statement of Delegate V. Rivers) (noting the example
(continued...)

Before statehood, responsibility for local governance largely fell to cities. The state constitution revised this system by creating boroughs with the potential to hold more power and more responsibility:

> The entire State shall be divided into boroughs, organized or unorganized. They shall be established in a manner and according to standards provided by law. . . . The legislature shall classify boroughs and prescribe their powers and functions.[60]

Through the borough system, the delegates sought to avoid the redundancy, confusion, and unnecessary costs of overlapping county-city systems elsewhere in the nation.[61] Given such concerns they decided not to grant school districts taxing power.[62] Instead the delegates made local schools dependent on boroughs for money.[63] While the delegates entrusted the State with "establish[ing] and maintain[ing] a system of public

---

[59]    (...continued)
of existing inducements to organize like refunds of taxes "a percentage, at least, of which reverts back to the organized area").

[60]    Alaska Const. art. X, § 3.

[61]    *See, e.g.*, 4 PACC 2630 (Jan. 19, 1956) (statement of Delegate V. Fischer) ("Once you get started on [granting taxing authority], each separate function could well justify an independent tax levying authority and then you are right back to the type of government that we are trying to avoid in Alaska, the overlapping of independent taxing jurisdictions."); *id.* at 2632 (statement of Delegate Doogan) ("The thing that is wrong with that fiscal autonomy [giving local school boards taxing authority] is that . . . if they were not careful they could break any municipality within a school district.").

[62]    *See* Alaska Const. art. X, § 2 ("The State may delegate taxing powers to organized boroughs and cities only.").

[63]    *See* Alaska Const. art. X, § 2; 4 PACC 2632 (Jan. 19, 1956) (statement of Delegate Doogan) ("Consequently, with the [borough] assembly having more than the one function of having schools, having many other functions and so many tax dollars, then would be able to distribute the funds as equitably as possible.").

schools open to all children of the State,"[64] they anticipated that boroughs likely would have to levy a tax to provide for schools.[65]

The delegates recognized that the transition to the borough system would take time.[66] In allocating power and responsibility under the Alaska Constitution, the delegates sought to provide the State with room to grow and to adapt. They designed the

---

[64]     Alaska Const. art. VII, § 1.

[65]     4 PACC 2652 (Jan. 19, 1956) (statement of Delegate Doogan) ("The borough, of necessity, . . . to provide for its operation would probably have a certain basic tax to provide schools . . . ."); *see also id.* at 2648 (statement of Delegate Doogan) ("The [S]tate would of necessity provide certain basic functions. . . . [T]he [S]tate then could very easily delegate whatever it wanted to do to the borough . . . ."); *Matanuska Susitna Borough Sch. Dist. v. State*, 931 P.2d 391, 399 (Alaska 1997) (highlighting the legislature's authority to delegate such responsibility while still retaining control over education).

[66]     4 PACC 2650 (Jan. 19, 1956). As Delegate Victor Rivers explained:

> We thought that at the state level it would be the policy as it has been in the past to offer certain inducements to them to organize. Now, *at the present time in incorporated cities there are certain refunds of taxes* in the nature of license taxes, liquor taxes, *and other taxes that are a percentage, at least, of which reverts back to the organized area.* In the extent that the benefits the legislature sets up will offset the added cost to the people, . . . but it was our thought there would be enough inducement for them to organize and exercise home rule so that as time went on they would gradually all become incorporated boroughs. . . . The thought was that inducements to organize would be offered on the basis of the granting of home rule powers plus certain other inducements that would make it advantageous to them to be boroughs, as we now have that same program of inducement to organize communities.

*Id.* (emphases added).

constitution to be flexible so that the legislature could fill in the "exact details [later]."[67] Though the delegates sought to limit certain powers and to avoid certain pitfalls, they did not intend to compel the State to unravel existing programs nor did they intend to prevent the State from experimenting and adapting to changing circumstances.

### 3. Early legislation built upon the pre-statehood laws that required the Territory and local communities to share responsibility for local schools.

Early post-statehood legislation filled in the gaps of the constitutional framework. In 1961 the legislature enacted incorporation standards for boroughs, as required under article X, section 3 of the Alaska Constitution, and delegated significant responsibility to them.[68] As the delegates envisioned,[69] those responsibilities included the State's constitutional obligation to provide public schools.[70]

---

[67]    *Id*. at 2647 (statement of Delegate Rosswog) (noting that the delegates sought to develop a "flexible" framework on which the legislature could build and fill in the "exact details . . . by law"); *see also id*. at 2654 (statement of Delegate V. Fischer) ("[A]t the same time we visualize the possibility that as the borough becomes a more definite unit of government over the years" it will assume those functions that it could "best . . . carr[y] out.").

[68]    *See* Alaska Const. art. X, § 3.

[69]    *See* 4 PACC 2629 (Jan. 19, 1956) (statement of Delegate V. Fischer) (explaining boroughs' responsibility for schools); *id*. at 2652 (statement of Delegate Doogan) (noting that boroughs likely would have to levy taxes to support schools); *see also Bradner v. Hammond*, 553 P.2d 1, 4 n.4 (Alaska 1976) ("Contemporaneous interpretation of fundamental law by those participating in its drafting has traditionally been viewed as especially weighty evidence of the framers' intent.").

[70]    *See* Alaska Const. art. VII, § 1.

The 1961 act charged boroughs with "establish[ing], maintain[ing], and operat[ing] a system of public schools on an areawide basis."[71] To fulfill this mandate, boroughs were given responsibilities like those of cities. State laws that governed city school districts now also governed borough school districts, including those related to "financial support . . . and other general laws relating to schools."[72] These financial support laws and other general school laws were largely the same as those in place pre-statehood.[73] As in the Territory, local communities, including boroughs, were required to support local schools.[74]

In a 1962 act, the legislature began to adapt the pre-statehood cooperative program for providing school services to the borough system of governance. The legislature clarified that "[e]ach organized borough constitutes a borough school district."[75] Like the Territory, the State continued to oversee local school operations, budgeting, and spending,[76] and it shared responsibility for administering and supervising

---

[71]     Ch. 146, § 3.33(a), SLA 1961.

[72]     *Id*. § 3.33(b).

[73]     *See, e.g.*, former AS 14.15.230–.750 (1962). As the legislative history reveals, many of these laws remained unchanged since 1949. *See, e.g.*, former AS 14.15.230 (1962) (originally enacted as § 37-3-31 ACLA (1949)); former AS 14.15.240 (1962) (originally enacted as § 37-3-32 ACLA); former AS 14.15.450 (1962) (originally enacted as § 37-3-54 ACLA).

[74]     Ch. 146, § 3.33, SLA 1961.

[75]     Ch. 110, § 9, SLA 1962.

[76]     *See* former AS 14.05.010 (1962) (originally enacted as § 37-1-2 ACLA (1949)); AS 14.10.010 (1962) (originally enacted as § 37-2-7 ACLA); AS 14.10.300 (1962) (originally enacted as § 37-2-53 ACLA).

the system of public schools with local school boards.[77] And the 1962 act began to refine the system, developing the public school foundation account to provide state funding for public schools on an annual basis and fine-tuning the method for calculating the amount of state aid and the required local contribution.[78] The State and local communities continued to support schools together.

Statutes enacted soon after statehood generally reflect the framers' intent.[79] Post-statehood, as the delegates envisioned, the legislature continued to hold local communities responsible for supporting schools under the borough system of local governance. While the State "of necessity provide[d] certain basic functions,"[80] it also, as the delegates anticipated, delegated some of its duties to boroughs with the understanding that boroughs "would probably have a certain basic tax to provide schools" to borough residents.[81]

### 4. Subsequent legislation did not alter the basic framework of state-local cooperation in providing local public schools.

In 1966, as the borough system began to gain traction, the legislature divided school districts into three categories. Organized cities located outside an

---

[77]      Former AS 14.05.100 (1962) (originally enacted as § 37-1-12 ACLA).

[78]      Former AS 14.17.010–.040 (1962); *see also* former AS 14.15.050–.070 (1962). The legislature also recognized that the transition to the borough system would take time. Accordingly, until 1966, the legislature left in place many of the parallel territorial laws that required cities to support local schools. Ch. 98, § 61, SLA 1966 (repealing AS 14.15).

[79]      *See Bradner v. Hammond*, 553 P.2d 1, 4 n.4 (Alaska 1976); *Se. Alaska Conservation Council v. State*, 202 P.3d 1162, 1172 (Alaska 2009).

[80]      4 PACC 2648 (Jan. 19, 1956) (statement of Delegate Doogan).

[81]      *Id*. at 2652 (statement of Delegate Doogan).

organized borough were responsible for managing and controlling a city school district; organized boroughs were responsible for the district within their boundaries; and districts outside organized boroughs and cities were operated (and fully funded) by the State.[82] As before the State required city and borough districts to help maintain and operate local schools with money "raised from local sources," and the State agreed to contribute an amount defined by a statutory formula.[83]

From 1969 to 1970, as the Borough notes, the legislature redefined state aid under Chapter 17 of the statute to equal each district's basic need.[84] And it repealed provisions mandating that local communities contribute to local school funding, including AS 14.17.030 (required local effort) and AS 14.17.130 (computation of required local effort).[85] But the legislature left the state-local cooperation foundation untouched. As was true in 1961, "[e]ach organized borough constitute[d] a borough school district" and each organized borough was required to "establish, maintain, and operate a system of public schools on an areawide basis."[86]

---

[82] Former AS 14.12.010, .020 (1966) (original version at ch. 98, § 1, SLA 1966).

[83] Former AS 14.12.020(c) (1966) (original version at ch. 98, § 1, SLA 1966). The amount of the state contribution depended on factors like the number of schools in the district, the district's need for special education services, and the specific characteristics of the district. AS 14.17.050–.070 (1966).

[84] Ch. 95, § 1, SLA 1969 ("The amount of state aid is the basic need.").

[85] Ch. 95, § 11, SLA 1969.

[86] *Compare* AS 07.15.330(a) (1970) ("[T]he first and second class borough shall establish, maintain, and operate a system of public schools on an areawide basis."), *with* ch. 146, § 3.33(a), SLA 1961 ("The first and second class borough shall establish, maintain, and operate a system of public schools . . . .").

The next year, in 1970, legislators again explicitly mandated that local communities and the State work together to fund local schools. The revised formula for allocating responsibility between the State and local communities experimented with new variables.[87] For example, it determined state aid based on taxable property values within the district in light of the number of students a district served.[88] Previously, the required local effort considered only the taxable property within the district; it did not standardize that value.[89]

In 1980, as the Borough points out, the legislature again tweaked the school funding system. Rather than separately calculate a district's "state aid" and a district's

---

[87] AS 14.17.021(c)(5) (1970), *as amended by* ch. 238, § 4, SLA 1970 ("[S]tate aid as computed under this section shall constitute at least 90 per cent of the basic need as defined by the department of each school district."). A district would only receive state aid if it satisfied its required local funding obligation. AS 14.17.071(a) (1970), *as amended by* ch. 238, § 4, SLA 1970 ("Payment of state aid to a local school district under this chapter is contingent upon matching by the district in the amount of the required local effort for that district in the ratio of required local effort . . . .").

[88] AS 14.17.021(c)(3) (1970), *as amended by* ch. 238, § 4, SLA 1970 (defining state aid with respect to the "full and true value of taxable real and personal property within the district divided by the average daily membership of the district").

[89] *Compare* AS 14.17.021(c)(3) (1970), *as amended by* ch. 238, § 4, SLA 1970 (defining state aid with respect to the "full and true value of taxable real and personal property within the district divided by average daily membership of the district"), *with* AS 14.17.030(b) (1963) (defining the required local effort in terms of "the full and true value of taxable real and personal property within the district" but not referring to the number of students in the district). The legislature repealed AS 14.17.030 in 1969. Ch. 95, § 11, SLA 1969. The legislature had last amended the statute in 1963. *See* former AS 14.17.030 (1966) (identifying the most recent amendment as session laws of 1963, chapter 70, section 1).

"basic need," the statute calculated only a district's "basic state aid."[90] Through this shift in focus, the statute no longer set out to estimate a district's basic need or a district's total budget. Unlike before, the statute did not consider local contributions.[91] But it also did not rule them out.[92] After all, as before, the State continued to hold boroughs responsible for "establish[ing], maintain[ing], and operat[ing] a system of public schools on an areawide basis."[93]

Subsequently in 1986 the legislature again reformulated the state aid calculation. It reinstated the requirement that local communities contribute to local school funding.[94] And the amount of state aid continued to reflect factors like the number of schools in the district, the district's need for special education services, and

---

[90] *Compare* ch. 26, § 4, SLA 1980 (reframing AS 14.17.021(a) as "[t]he amount of basic state aid for which each district is eligible" and omitting references to "basic need"), *with* ch. 90, §§ 2–3, SLA 1977 (separately defining "state aid" and "basic need").

[91] *Compare* ch. 26, § 4, SLA 1980 (noting only that the state aid could be reduced in light of federal contributions), *with* ch. 90, § 3, SLA 1977 (mandating that state aid constitute "at least 97 per cent of the basic need" of each school district).

[92] AS 14.17.220 (1982) ("This chapter shall not be interpreted as preventing a public school district from providing educational services and facilities beyond those assured by the foundation program."). As the annotated statutes reveal, in 1982 this section had not been revised since 1962 when the legislature enacted the provision. *Id.* (noting only the 1962 enactment under session laws chapter 164, section 1.01).

[93] AS 29.33.050 (1984) (identifying the most recent amendment as session laws of 1975, chapter 13, section 6, and chapter 124, section 34). In 1972, the legislature repealed former titles 7 (boroughs) and 29 (municipal corporations) and reenacted the provisions under title 29, including those related to borough duties. Ch. 118, SLA 1972.

[94] Ch. 75, §§ 2–3, SLA 1986.

a district's specific characteristics.[95]

The legislature has continued to refine this program, as the delegates envisioned it would, but the program's pre-statehood core has remained intact. Just as the Compiled Laws of Alaska charged local communities with "provid[ing] the necessary funds to maintain [local] public schools,"[96] title 14, chapter 17 requires boroughs and cities to fund schools with money raised from local sources.[97] While the details of this state-local cooperative program have changed, the legislature has never relieved local communities of their longstanding obligation to support local public schools. Rather as one delegate stated when explaining the rationale for shifting the onus of education from cities to boroughs: "When you come to the borough though, the borough is interested in education. It will be one of the basic functions which it will be responsible for."[98]

---

[95] *See* ch. 75, §§ 2, 5, SLA 1986. Section 2 defined state aid for a district in light of its "instructional unit allotment," and § 5 defined "instructional units" to include some of the above factors. *Id*. The next year, the legislature refined this longstanding cooperative framework, creating new sections for some of the 1986 mandates and combining other mandates with existing sections. *See, e.g.*, ch. 91, §§ 3-4, SLA 1987 (recalibrating the formula for state aid and local contributions); *id*. § 25 (repealing the former provisions).

[96] § 37-3-32 ACLA (1949).

[97] AS 14.12.020(c) ("The borough assembly for a borough school district . . . shall provide the money that must be raised from local sources to maintain and operate the district."); AS 14.17.410(b) ("Public school funding consists of state aid, a required local contribution, and eligible federal impact aid . . . ."). The legislature has left the AS 14.12.020 mandate untouched since 1975. *See* AS 14.12.020.

[98] 4 PACC 2629 (Jan. 19, 1956) (statement of Delegate V. Fischer). *Compare* AS 14.12.020 (2015), *with id*. (1975), *id*. (1966), former AS 07.15.330 (1966), *and* ch. 146, § 3.33, SLA 1961.

**5.** **We have yet to consider the dedicated funds clause in light of state-local cooperative programs.**

The Borough argues that *State v. Alex* and its progeny dictate that the local funding formula of AS 14.12.020(c) and 14.17.410(b) violates the dedicated funds clause. But *Alex* and its progeny do not dictate the result here. Never before have we considered this type of longstanding state-local cooperative program.

**a.** ***State v. Alex***

We first considered the scope of the dedicated funds clause in *State v. Alex*.[99] There, a group of commercial fishers alleged that a statute authorizing mandatory assessments on their salmon sales "for the purpose of providing revenue for . . . qualified regional [aquaculture] association[s]" violated the dedicated funds clause.[100] We agreed with the fishers and accordingly rejected the State's argument, which attempted to distinguish between "general revenue taxes" (subject to the dedicated funds clause) and "special assessments" for services (allegedly not subject to the clause).[101] In doing so, we adopted a broad meaning of "tax" in light of the origin of the clause's prohibition. We considered the debates at the Convention; the studies the delegates relied on when drafting the section, including those that emphasized importance of protecting State control over state revenue; and how the delegates revised the clause, including the

---

[99]    646 P.2d 203 (Alaska 1982).

[100]    *Id*. at 204-05 (Alaska 1982).

[101]    *Id*. at 208.

change from "all revenues" to the "proceeds of any state tax or license."[102] In light of this context, we held that the clause prohibited dedicating not only taxes but also special assessments like the one at issue in *Alex*.[103]

But unlike this case, *Alex* did not ask us to consider a longstanding state-local cooperative program. In *Alex*, the program at issue was first enacted in 1976, nearly 20 years after Alaska became a state, and there was no evidence suggesting that the program was one the delegates intended would fall outside the clause.[104] The regional aquaculture associations, who would benefit from the assessment, were also established in 1976, long after Alaska became a state.[105] Accordingly in *Alex* we did not consider whether a longstanding state-local cooperative program was a "state tax or license" within the meaning of the dedicated funds clause.

### b. *City of Fairbanks v. Fairbanks Convention & Visitors Bureau*

In *City of Fairbanks*, we evaluated the constitutionality of a voter initiative that restructured how the city allocated bed tax revenues.[106] Article XI, section 7 of the Alaska Constitution prohibits any initiative that dedicates or appropriates funds,[107] and

---

[102] *Id*. at 209-10.

[103] *Id*. at 210.

[104] Ch. 190, § 1, SLA 1976; ch. 154, §§ 14–16, SLA 1977.

[105] Ch. 161, § 2, SLA 1976.

[106] *City of Fairbanks v. Fairbanks Convention & Visitors Bureau*, 818 P.2d 1153, 1153-54 (Alaska 1991).

[107] Alaska Const. art. XI, § 7 ("The initiative shall not be used to dedicate revenues, make or repeal appropriations . . . .").

the initiative's opponents argued that it did both.[108]  We held that the initiative did not dedicate funds because it actually increased the council's flexibility to make spending decisions.[109]  We relied on *Alex* to determine whether the initiative dedicated funds because it was the only other time we had considered the meaning of dedicated revenues.[110]

But we did not interpret the dedicated funds clause of article IX, section 7 in *City of Fairbanks*.  Article XI (at issue in *City of Fairbanks*), unlike article IX (at issue here and in *Alex*), defines the scope of the initiative, referendum, and recall process.[111]  By contrast article IX defines the scope of a different set of powers, those related to state finance and taxation.[112]  Because *City of Fairbanks* considered an entirely different set of powers, that decision has no bearing here.

### c.    *Sonneman v. Hickel*

Ten years after *Alex*, we considered the dedicated funds clause for the second time in *Sonneman v. Hickel*, where we held unconstitutional in part the act that created the Alaska Marine Highway System Fund.[113]  The legislature established the Alaska Marine Highway System Fund as a special account in the general fund and required the Alaska Marine Highway System, which operates the Alaska ferries, to

---

[108]    *City of Fairbanks*, 818 P.2d at 1155.

[109]    *Id*. at 1158-59.

[110]    *Id*. at 1158.

[111]    Alaska Const. art. XI.

[112]    Alaska Const. art. IX.

[113]    836 P.2d 936, 937, 940 (Alaska 1992).

deposit its gross revenue into that account.[114] Through the act, the legislature sought to create incentives for the Marine Highway System by setting aside some of its revenue for its own use.[115] Among other provisions, the act outlined how the legislature and the Department of Transportation and Public Facilities, which houses the Marine Highway System, could appropriate and could request money from the fund, and it dictated how the legislature could spend the money therein.[116]

We found that such provisions restricted executive authority to request appropriations.[117] Accordingly we held that the statute violated the dedicated funds clause of article IX, section 7.[118] In doing so, we recognized that a statute can impermissibly dedicate funds in various ways: A statute could require the legislature to use funds only for a specified purpose or, as in *Sonneman*, the statute could preclude agencies from requesting an appropriation for a given purpose.[119]

But *Sonneman* does not control our decision here either. Nothing in *Sonneman* suggests that the restriction on executive authority over marine highway

---

[114] *Id*. at 937-38.

[115] *Id.* at 938-39 (stating that the act is based on the principle that "the administrators of the Alaska Marine Highway System and the legislature will treat the fund as if the Marine Highway System had a right to its proceeds . . . .").

[116] *Id*. at 938.

[117] *Id*. at 940.

[118] *Id*.

[119] *Id*. ("As the debates make clear, all departments were to be 'in the same position' as competitors for funds with the need to 'sell their viewpoint along with everyone else.' " (quoting 4 PACC 2364-67 (Jan. 17, 1956))).

revenue existed before statehood. And, unlike the school funding formula at issue here, in *Sonneman* we did not consider a state-local cooperative program in which local communities and the State share responsibility for providing a local public service.

### d. *Myers v. Alaska Housing Finance Corp.*

Another ten years passed before we again considered the dedicated funds clause. In *Myers v. Alaska Housing Finance Corp.*, we upheld a legislative scheme for selling anticipated future state revenue from a settlement against tobacco companies so that it could fund rural school improvements.[120] The legislature accomplished the scheme in three steps: First, the legislature deemed the State's right to future settlement payments to be an asset.[121] As with other assets, the State could sell the future settlement payments for a lump sum amount that reflected the present value of the anticipated revenue stream.[122] Second, the legislature issued revenue bonds secured by the estimated present value of the settlement.[123] Finally, the legislature then appropriated a portion of the bond proceeds to fund the necessary school improvements.[124]

Though the tobacco settlement fell within the scope of the dedicated funds clause and though the scheme dedicated future state revenue, we concluded that the scheme was constitutional.[125] We explained that unlike *Alex* and *Sonneman*, which clearly dealt with the allocation of future revenues, the revenue allocation scheme in

---

[120] 68 P.3d 386, 387-88 (Alaska 2003).

[121] *Id*. at 388.

[122] *Id*.

[123] *Id*.

[124] *Id*.

[125] *Id*. at 390-91.

*Myers* was different.[126]   The scheme in *Myers* reduced future revenue to present value and used that value to secure bonds, the proceeds of which would be dedicated to fund school improvements that year.[127]

> ### e.    *Southeast Alaska Conservation Council v. State*

Most recently, in *Southeast Alaska Conservation Council*, we returned to the dedicated funds clause when we struck down an act that transferred state land to the University of Alaska and then directed that income derived from that land be held in trust for the University.[128]   Before concluding that the act was unconstitutional, we engaged in a two-part inquiry.   First, we concluded that proceeds from the land were within the scope of the clause's reference to "proceeds of any state tax or license."[129]   In doing so, we reiterated our warning in *Alex* that the "constitution prohibits the dedication of any source of revenue."[130]   And we explained that, unlike *Myers*, the act did not contemplate a non-recurring appropriation, which as in *Myers* would have been permissible under the clause.[131]

Second, we considered whether the University was exempt from the dedicated funds prohibition by virtue of an implied exception under article VII, section 2 of the Alaska Constitution, which authorized the University to hold title to real

---

[126]    *Id*. at 392.

[127]    *Id*. at 389.

[128]    202 P.3d 1162, 1165-66, 1177 (Alaska 2009).

[129]    *Id*. at 1169.

[130]    *Id*. (quoting *State v. Alex*, 646 P.2d 203, 210 (Alaska 1982)).

[131]    *Id*. at 1170; *see Myers*, 68 P.3d at 392.

property.[132]  In rejecting this argument, we explained that our case law establishes that University lands are state lands over which the State retains authority regardless of whether the University holds title.[133]  As a result, all revenue from University land is state revenue subject to the clause.[134]

*Southeast Alaska Conservation Council* did not rule out the possibility that we might find other statutes exempt from the dedicated funds clause.  Like the other cases in this line, it did not address a longstanding cooperative program, like the school funding program, in which local governments and the State share responsibility for providing a local public service.  Such programs do not violate the dedicated funds clause.

Here we are asked for the first time whether local contributions to longstanding cooperative programs in which the State and local governments share funding responsibility run afoul of the dedicated funds clause.  The minutes of the constitutional convention and the historical context of those proceedings reveal that the delegates did not intend for required local contributions to such programs to be included in the term "state tax or license."  Today's statutory program for funding local public schools falls squarely within the type of state-local cooperative programs the delegates

---

[132]  *Se. Alaska Conservation Council*, 202 P.3d at 1170-71; *see* Alaska Const. art. VII, § 2 ("[The University of Alaska] shall have title to all real and personal property now or hereafter set aside or conveyed to it.  Its property shall be administered and disposed of according to law.").

[133]  *Se. Alaska Conservation Council*, 202 P.3d at 1171.

[134]  *Id*. at 1172.

sought to exempt from the constitutional prohibition on dedicated funds. We therefore conclude that the existing school funding formula does not violate the dedicated funds clause.

## B. The School Funding Formula Does Not Violate The Appropriations Or Governor's Veto Clauses.

We agree with the superior court that the required local contribution does not violate the appropriations clause or the governor's veto clause of the Alaska Constitution.

Article IX, section 13, the appropriations clause, provides: "No money shall be withdrawn from the treasury except in accordance with appropriations made by law. No obligation for the payment of money shall be incurred except as authorized by law. Unobligated appropriations at the end of the period of time specified by law shall be void."[135] Article II, section 15, the governor's veto clause, provides: "The governor may veto bills passed by the legislature. He may, by veto, strike or reduce items in appropriation bills. He shall return any vetoed bill, with a statement of his objections, to the house of origin."[136]

Like the dedicated funds clause, the appropriations clause and the governor's veto clause both address how the State spends state revenue. Together the clauses govern the legislature's and the governor's "joint responsibility . . . to determine the State's spending priorities on an annual basis."[137] As with our preceding analysis, we must interpret these constitutional clauses "according to reason, practicality, and

---

[135] Alaska Const. art. IX, § 13.

[136] Alaska Const. art. II, § 15.

[137] *Simpson v. Murkowski*, 129 P.3d 435, 447 (Alaska 2006) (quoting the trial court decision).

common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters."[138]

The Borough argues that the required local contribution is an appropriation that bypasses the constitutionally mandated appropriations process and that the governor's veto clause requires that the governor be given the opportunity to veto this appropriation. If we assume the required local contribution is local money as the State contends, the required local contribution would not violate either the appropriations clause or the governor's veto clause because these clauses address *state* money, not local money. On the other hand, even if we assume that the local contribution is state money as the Borough contends, the required local contribution still would not violate either clause. The local contribution never enters the state treasury, and it is never subject to appropriations bills. The appropriations clause, per its plain language, applies to withdrawals from the state treasury, and the governor's veto applies to appropriation bills.[139] The required local contribution does not withdraw from the state treasury; and it is not an appropriation bill.

The Borough correctly points out that the constitutional delegates intentionally established a system in which both the legislature and the governor would consider how to spend state money each year. But while all three clauses — the dedicated funds clause, appropriations clause, and governor's veto clause — address power over the state budget, the plain meaning of each clause reveals three distinct purposes. Through the dedicated funds clause, the delegates sought to avoid the evils of earmarking, which the delegates feared would "curtail[] the exercise of budgetary

---

[138]    *West v. State, Bd. of Game*, 248 P.3d 689, 694 (Alaska 2010) (quoting *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999)).

[139]    *See* Alaska Const. art. II, § 15; Alaska Const. art. IX, § 13.

controls and simply [would] amount[] to an abdication of legislative responsibility."[140] The delegates sought to protect State control over state revenue and to ensure legislative flexibility.[141] By contrast, the appropriations clause defines how the legislature may spend state money *after* it has entered state coffers, and the governor's veto clause provides an executive check on the legislature's spending plan.[142] Because the plain language of both the appropriations and governor's veto clauses indicates that these clauses restrict the State's power *after* money enters the state treasury, not before, the required local contribution does not violate either clause.

### C. The Borough Is Not Entitled To A Refund Of Its Protested Payment.

Because we find the required local contribution constitutional, we need not consider the Borough's request for a refund of its protested payment. Accordingly, we uphold the superior court's denial of the Borough's request.

## V. CONCLUSION

We REVERSE the superior court's decision granting summary judgment in favor of the Borough and REMAND to allow the court to enter judgment in favor of the State.

---

[140] *State v. Alex*, 646 P.2d 203, 209 (Alaska 1982) (citing ALASKA STATEHOOD COMM'N, *supra* note 44, at 29-30).

[141] *Id*.; *see also* FORMAL OP. ATT'Y GEN., *supra* note 44, at 3.

[142] *See* Alaska Const. art. II, § 15; Alaska Const. art. IX, § 13.

STOWERS, Chief Justice, concurring.

I join in the court's opinion. But like Justice Winfree, I am concerned that the court was not given the opportunity to decide the dedicated funds question controlled by article IX, section 7 of the Alaska Constitution as presented by this appeal in the fuller context of the public schools clause of article VII, section 1 of the Alaska Constitution. I do not believe that this court's opinion today necessarily determines that the State's required local contribution would survive constitutional scrutiny under article VII, section 1 — it might, it might not — but the parties intentionally did not litigate this question either in the superior court or this court, and notwithstanding pointed questions by several justices in oral argument inquiring into the potential application of article VII, section 1, the parties adamantly insisted that constitutional provision was not in issue. In my view, therefore, the question whether the State's required local contribution is constitutional under the public schools clause remains an undecided question.

WINFREE, Justice, concurring.

Statutes are presumed to be constitutional, and the party challenging a statute's constitutionality has the burden of persuasion; doubts are resolved in favor of constitutionality.[1] Although I have considerable doubt about the constitutionality of the statutorily required local contribution (RLC) public schools funding component, I cannot conclude that the presumption has been overcome in this case. I therefore agree that the superior court's primary decision — that the RLC is an unconstitutional dedicated tax — should be vacated. But I do not rule out an ultimate conclusion that the RLC is unconstitutional, as a dedicated tax or otherwise, and therefore do not join the court's analysis or decision on this point.[2] In my view the question cannot be answered definitively without a full interpretation and understanding of the Alaska Constitution's public schools clause, which, apparently for strategic reasons, the parties did not confront.

Addressing how the RLC has every appearance of a dedicated tax warrants a brief discussion of the public schools clause. Article VII, section 1 of the Alaska Constitution states in relevant part: "The legislature shall by general law establish and maintain a system of public schools open to all children of the State . . . ."

We addressed this provision in *Macauley v. Hildebrand*,[3] when we reversed a superior court decision allowing a borough to require that a non-consenting borough school district use the borough's centralized system for accounting control over funds

---

[1]     *Alaskans for a Common Language, Inc. v. Kritz*, 170 P.3d 183, 192 (Alaska 2007).

[2]     I agree with the court's analysis and conclusion affirming the superior court's secondary decision that the RLC does not violate the Alaska Constitution's appropriations or governor's veto clauses.

[3]     491 P.2d 120 (Alaska 1971).

appropriated to the school district.[4]  An existing statute allowed centralized accounting upon the school district's consent, and the issue before us was the validity of the borough ordinance conflicting with the statute.[5]  We stated the general rule that, notwithstanding the constitution granting broad powers to home rule municipalities,[6] "the determination of whether a home rule municipality can enforce an ordinance which conflicts with a state statute depends on whether the matter regulated is of statewide or local concern."[7] We held that the question was controlled by article VII, section 1:

> This constitutional mandate for pervasive state authority in the field of education could not be more clear.  First, the language is mandatory, not permissive.  Second, the section not only requires that the legislature "establish" a school system, but also gives to that body the continuing obligation to "maintain" the system.  *Finally, the provision is unqualified; no other unit of government shares responsibility or authority*.[8]

We later confirmed that article VII, section 1's mandate that the legislature establish and

---

[4]     *Id*. at 121-22.

[5]     *Id*. at 121.

[6]     *Cf.* Alaska Const. art. X, § 11.

[7]     *Macauley*, 491 P.2d at 122 & n.4.

[8]     *Id*. at 122 (emphasis added) (footnote omitted) (quoting Alaska Const. art. VII, § 1).  We also noted that the legislature's delegation of "certain educational functions" to local school boards "does not diminish this constitutionally mandated state control over education."  *Id*.

maintain a public schools system has a dual nature: "It imposes a [constitutional] duty upon the state legislature, and it confers upon Alaska school age children a [constitutional] right to education."[9]

In what otherwise is a vacuum the RLC has all the hallmarks of an unconstitutional dedicated tax. The RLC is a State-imposed mandate that municipalities raise specified funds for the State's public schools system; it is a revenue source for the State — and a tax by any other name remains a tax[10] — and the revenues are dedicated to the State's public schools system even though they never enter the State's treasury.[11]

I find unpersuasive the court's conclusion that the RLC is exempt from the dedicated tax prohibition because it is a post-statehood continuation of a territorial dedicated tax or a cooperative effort to establish and maintain public schools. First, the RLC was not a part of the territorial municipal school funding system. (The territorial tax dedicated to schools discussed at the constitutional convention was a tobacco tax earmarked for school construction.[12]) In the territorial system municipal school districts were required to determine their own budgets and local tax-funding levels, but were promised some level of territorial reimbursement. Now the State determines a foundational "basic need" for all school districts and requires municipalities to fund specific amounts of that "basic need" in their school districts. The territorial system did not include a dedicated tax on municipalities; the current system appears to do so.

---

[9] *Hootch v. Alaska State-Operated Sch. Sys.*, 536 P.2d 793, 799 (Alaska 1975).

[10] *See State v. Alex*, 646 P.2d 203, 208-10 (Alaska 1982).

[11] *See id*. at 207-08.

[12] *See* 4 Proceedings of the Alaska Constitutional Convention (PACC) 2370 (Jan. 17, 1956).

Second, the State has the constitutional duty to establish and maintain the public schools system in Alaska, not municipalities. It is difficult to understand how mandatory delegation of functions and municipal funding for the State's public schools system can be a cooperative effort. More importantly, the court misperceives our earlier discussion about funding cooperative efforts — we did not suggest the framers approved of a state tax dedicated to a cooperative effort, but rather approved of dedicating State revenues, after they reach the State treasury, to a cooperative effort (and other uses of revenues).[13]

What then gives me pause? By apparent design, the tail may be wagging the dog — the parties appear to be using the dedicated tax clause to define the public schools clause's limits.

If we focus solely on the constitutional prohibition of dedicated taxes and conclude that the RLC is a dedicated tax, we may be inferentially but necessarily concluding that the public schools clause is a constitutional mandate that the State alone must provide the funds necessary to meet at least minimum constitutional requirements for the statewide unified public schools system.[14] Under this view municipal contributions to local public schools may not be compelled, but may be volunteered to supplement State funding to enhance local educational opportunities. This would be a remarkable conclusion to reach without ever considering the public schools clause.[15]

---

[13]     *Alex*, 646 P.2d at 209-10.

[14]     *Cf. Matanuska-Susitna Borough Sch. Dist. v. State*, 931 P.2d 391, 405 (Alaska 1997) (Matthews, J., joined by Rabinowitz, J., concurring) (noting public schools clause might support a constitutional claim when funds "are insufficient to pay for a level of education which meets standards of minimal adequacy").

[15]     I recognize that in *State v. Alex*, 646 P.2d at 210-11, we concluded that the legislature's general constitutional authority over natural resources could not be construed to override the constitutional prohibition of a dedicated tax, an analysis that

(continued...)

I certainly do not suggest that this interpretation of the public schools clause would be incorrect. Looking only at the constitutional language and our limited case law, a credible argument can be made that the constitution requires funding the public schools system in a significantly different manner than in territorial days.[16] The constitution mandates that the State, through the legislature, "establish and maintain" a public schools system,[17] and our case law establishes both that it is a unified public schools system[18] and that "no other unit of government" shares the State's obligation.[19] This seems inconsistent with a RLC; if the current RLC is allowable, the State theoretically could craft a RLC compelling a municipality to pay for all of its public schools system costs without any State contribution whatsoever.[20]

---

[15]     (...continued)
may apply in this context as well. But I decline to apply it in rote fashion without a full explication and understanding of the public schools clause.

[16]     *Cf.* Opinion, pp. 12-13.

[17]     Alaska Const. art. VII, § 1.

[18]     *Hootch v. Alaska State-Operated Sch. Sys.*, 536 P.2d 793, 799 (Alaska 1975).

[19]     *Macauley v. Hildebrand*, 491 P.2d 120, 122 (Alaska 1971).

[20]     This could have been possible in the territorial system because municipal school districts were required to set their own public schools budgets and related tax levels and then hope for territorial reimbursement. But this also seems inconsistent with the subsequent *constitutional* directive that the State, through the legislature, establish and maintain a statewide public schools system.

An interesting question not before us is whether the State could avoid its constitutional obligation to maintain a statewide unified public schools system by refusing to fund school operations if a municipality does not comply with the RLC mandate. *See* AS 14.17.410(d) (providing that if the RLC is not made, the State will not

(continued...)

On the other hand the public schools clause does not expressly provide that the State must fund the statewide public schools system.[21] Before statehood the territory did not alone fund municipal schools,[22] and there was little discussion of the public schools clause at the constitutional convention.[23] And as the court notes, shortly after statehood the legislature created a public schools funding framework inconsistent with the notion that the State is solely obligated to fund the public schools system.[24] Perhaps, as the court concludes — but not for its stated reasons — the RLC is constitutionally viable. But this conclusion may also inferentially and necessarily require the conclusion

---

[20]   (...continued)
provide any school funds); *cf. Matanuska-Susitna Borough Sch. Dist. v. State*, 931 P.2d 391, 405 (Alaska 1997) (Matthews, J., joined by Rabinowitz, J., concurring) (noting public schools clause might support a constitutional claim when funds "are insufficient to pay for a level of education which meets standards of minimal adequacy").

[21]   *Cf.* Alaska Const. art. VII, § 1.

[22]   *See* Opinion, pp. 12-13.

[23]   *See* VICTOR FISCHER, ALASKA'S CONSTITUTIONAL CONVENTION 140 (1975) ("Except for the proposed prohibition of public funds being used for direct benefit of private educational institutions, the [public education] article was not controversial. Lack of disagreement was due to the fact that the functions covered by the article were already being carried out under the territorial government.").

[24]   *See* Opinion, pp. 21-23. The court states that this reflects the framers' intent that the State could mandate local contributions to the statewide schools system, citing *Bradner v. Hammond*, 553 P.2d 1, 4 n.4 (Alaska 1976) ("Contemporaneous interpretation of fundamental law by those participating in its drafting has traditionally been viewed as especially weighty evidence of the framers' intent."). By my count 10 constitutional delegates were in the 60-member 1961-62 legislature: Delegates Coghill, Hellenthal, McNealy, McNees, Metcalf, Nolan, Peratrovich, Smith, Sweeney, and Taylor.

that the State does not have a constitutional duty to fund the statewide public schools system.

I am left with the following conclusions. If the public schools clause requires that the statewide schools system be funded to a constitutionally acceptable minimum by the State, then the RLC likely is an unconstitutional dedicated tax. If the public schools clause allows the legislature to require local funding for the statewide unified schools system, then, depending on its parameters for requiring local funding, the RLC may or may not be an unconstitutional dedicated tax. But, deliberately, the interpretation of the public schools clause was not litigated in the superior court and, therefore, was not meaningfully briefed in this appeal. Although I have considerable doubt that the RLC is constitutional, on this record and briefing I must resolve that doubt in favor of the presumption that it is constitutional.